Ester SZOKE, Plaintiff,

v.

Mack L. CARTER, Jr., individually and as Commissioner of Hospitals for the County of Westchester, Jeffrey Sweet, individually and as Assistant Personnel Director for the Westchester County Medical Center, Marilyn M. Corbett, individually, Herbert Morris individually, and the County of Westchester, Defendants.

No. 95 CV 1231 (BDP).

United States District Court, S.D. New York.

Aug. 25, 1997.

Jonathan Lovett, Lovett & Gould, White Plains, NY, for Plaintiff.

Theresa O'Rourke, White Plains, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Ester Szoke brings this action, pursuant to 42 U.S.C. § 1983, against Jeffrey Sweet, Herbert Morris, and the County of Westchester ("the County") alleging violations of her First Amendment and due process rights.[1] Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56. Additionally, defendant Sweet moves for an order disqualifying plaintiff's attorney, and plaintiff cross-moves, pursuant to Fed. R.Civ.P. 11, for sanctions against Sweet and his counsel for filing the motion seeking disqualification. For the reasons stated below,

defendants' motion for summary judgment is granted in part and denied in part. Sweet's motion to disqualify plaintiff's attorney, and plaintiff's cross-motion for sanctions are denied.

## BACKGROUND

On a motion for summary judgment, "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). The following facts are construed accordingly.

In February 1988, the County of Westchester ("the County") hired Ester Szoke to work as a senior laboratory technician in the Pathology Laboratory ("the Laboratory") at the Westchester County Medical Center ("WCMC"). WCMC operated the Laboratory until it was moved, some time after Szoke was hired, to a New York Medical College ("NYMC") facility. After the move, NYMC operated the Laboratory, under contract, for the County. It is undisputed that this new arrangement did not affect Szoke's status as a County employee.

On or about November 26, 1991, Szoke wrote and forwarded a memorandum to her supervisor, Marilyn Corbett, detailing concerns that she had about the safety of her work environment. In a memorandum dated November 26, 1991, Corbett informed Myron R. Melamed, the Chairman of the Department of Pathology at New York Medical College of Szoke's concerns.

Thereafter, on December 20, 1991, Szoke wrote Melamed directly ("December 1991 letter"), detailing the following concerns:

The ventilation in the Cytoprep space was very poor. I mentioned this to Ms. Corbett several times.

\* \* \* \* \* \*

I have found in the past, that while we function well at 20°C (68°F) the rest of the coworkers who are sitting all day with computers and microscopes, need much higher temperature. Since we do not have the staining set-ups under the hood, lower-

---

[1] As of the filing of this motion, Szoke had not served named defendants Mack L. Carter, Jr. and Marilyn M. Corbett. The Court deems the claims against those defendants abandoned.

ing the temperature is the only way that we can try to minimize evaporation of chemicals we constantly use.

\* \* \* \* \* \*

In addition to chemical fumes, in this small area we also are exposed to potentially infectious human biological materials. . . . [W]e should handle the non-GYN specimens under a sterile hood.

On January 30, 1992, Szoke forwarded a copy of the December 1991 letter to Stuart Newman, chairman of the Biosafety Committee at WCMC.

On July 16, 1992, Szoke was served with a Notice of Disciplinary Charges relating to two specific incidents of misconduct and insubordination. These charges resulted from Szoke's alleged refusal to follow the directions of her acting supervisor Leeanne Klimstra. On the basis of those disciplinary charges, then Commissioner Carter suspended Szoke without pay for thirty days, pursuant to New York State Civil Service Law § 75(3). On August 13 and September 4, 1992, an administrative fact-finding hearing was held before hearing officer Herbert Morris.

Meanwhile, on or about September 2, 1992, Szoke drafted and delivered a memorandum ("September 1992 memorandum") to Corbett expressing her concern about the processing of specimens at the Laboratory. Specifically, the memorandum states:

On August 17 or 18, I brought to your attention a potentially serious problem regarding the preparation of NON–GYN specimens . . . The inherent danger of specimen confusion is obvious, even for the most experienced laboratory personnel, in such a high volume laboratory as ours, where the work is so repetitious. . . . [T]he new procedure may not only further decrease the efficiency of specimen processing, but more importantly, may increase the probability of inadequate NON–GYN smears.

After the conclusion of the disciplinary hearing, Szoke, in a letter dated September 15, 1992 ("September 15, 1992 letter") and addressed to Carter, requested a transfer to another unit. In that letter, Szoke explained

how, since the Laboratory moved to its new facilities, she had questioned "(1) the irregularities and perhaps negligence of specimen handling" and "(2) adverse (health related) working conditions." According to the defendants, Carter purposefully did not read the letter because a final resolution of the disciplinary charges had yet to be rendered. The letter was instead rerouted to defendant Sweet, assistant personnel director of WCMC, who wrote back to Szoke acknowledging its receipt and explaining that "it would not [have been] appropriate for [Carter] to comment prior to receiving the report and recommendation from Morris."

Morris subsequently recommended a finding that Szoke was guilty of misconduct and/or insubordination. Sweet received Morris's report and recommendation and prepared a draft decision suspending plaintiff for approval by Carter. On November 17, 1992, Carter adopted all Morris's findings of fact and suspended plaintiff without pay from November 18, 1992 to December 17, 1992.

On or about October 28, 1992, plaintiff was served with another Notice of Disciplinary Charges relating to new incidents of alleged misconduct and/or insubordination. An administrative fact-finding hearing was held before Morris at the conclusion of which Morris issued a report and recommendation finding Szoke guilty of misconduct and/or insubordination. As with the earlier disciplinary hearing, Sweet drafted a decision based on Morris's report and recommendation. Upon review of the transcript of the hearing and review of Morris's report and recommendation, Carter, on January 15, 1993, signed Sweet's draft decision and terminated plaintiff from her position as a Senior Laboratory Technician.

On May 6, 1993, plaintiff filed a petition pursuant to Article 78 of the New York State Civil Practice Law and Rules seeking judicial review of her termination, annulment of her termination, and reinstatement of employment with back pay and benefits. The gravamen of her allegations was that she was denied, without due process, her right to a fair hearing. She did not submit for determination any questions regarding the substantiality of the evidence against her in the

two disciplinary hearings. On December 7, 1994, Justice Kenneth Lange of New York Supreme Court denied Szoke's petition. Szoke did not appeal that decision.

Szoke then commenced the instant action on February 21, 1995 alleging that the defendants, in violation of her First Amendment rights, retaliated against her for expressing her concern about Laboratory conditions.[2] Szoke further asserted claims alleging violations of her due process rights. Defendants then moved for summary judgment, pursuant to Fed.R.Civ.P. 56. On December 23, 1996, defendant Sweet moved for an order disqualifying plaintiff's counsel in this matter. Plaintiff responded to Sweet's motion by filing a motion, pursuant to Fed.R.Civ.P. 11, for sanctions.

 This Court subsequently directed the parties to brief the question of whether the *Rooker–Feldman* doctrine bars plaintiff's claims. *See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidel-*

*ity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).[3] In a July 22, 1997 letter brief addressing that issue, plaintiff withdrew her due process claims and represented to the Court that she has no intention of substituting the estate of defendant Morris, who had recently died, as defendant in this action. Thus, only plaintiff's First Amendment claims against Sweet and the County remain for this Court's consideration.

## DISCUSSION

### A. Rooker-Feldman Doctrine

 Under the *Rooker–Feldman* doctrine, which evolved from the Supreme Court's opinions in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) and *Rooker v, Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), federal district courts lack jurisdiction to review state court decisions whether final or interlocutory in nature.[4] *See Rooker,* 263 U.S. 413, 44

2. Plaintiff alleges that her dismissal was (1) "premised upon Plaintiff's expression of her opinion regarding matters of public concern" and (2) "premised upon Plaintiff's petitioning of government for the redress of grievances regarding matters of public health and safety." The First Amendment right to petition the government, "which is an assurance of a particular freedom of expression ... is 'generally subject to the same constitutional analysis' as the right to free speech.'" *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.1993) (citing *Wayte v. United States,* 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 1532 n. 11, 84 L.Ed.2d 547 (1985)). Accordingly, the two claims will be treated collectively for the purposes of this motion.

3. A challenge to a federal court's subject matter jurisdiction under the *Rooker–Feldman* doctrine "may be raised at any time by either party or *sua sponte* by the court." *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 136 (2d Cir.1997). (citing *Moccio v. New York State Office of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996)).

4. Plaintiff contends that her express reservation of her federal claims from consideration in the state court proceeding, under *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), necessarily precludes the *Rooker–Feldman* doctrine from divesting this Court of subject matter jurisdiction over those federal claims. Plaintiff, however, presents no authority for that proposition,

which this Court, in any event, finds meritless for the following reasons.

First, under *England,* a plaintiff can safeguard her right to litigate her federal claims in federal court by reserving the right to do so on the state court record. The so-called *England* reservation is premised on the plaintiff having "properly invoked federal-court jurisdiction in the first instance on a federal claim." *Allen v. McCurry,* 449 U.S. 90, 101 n. 17, 101 S.Ct. 411, 418 n. 17, 66 L.Ed.2d 308 (1980); *see England,* 375 U.S. at 421–22, 84 S.Ct. at 467–68. Second, "the holding in *England* depended entirely on [the Supreme] Court's view of the purpose of abstention in" a particular case. *See Allen,* 449 U.S. at 101–02 n. 17, 101 S.Ct. at 418 n. 17; *Temple of the Lost Sheep, Inc. v. Abrams,* 930 F.2d 178, 181 (2d Cir.1991). Thus, while a plaintiff has the right to reserve her federal claims where the purpose of the federal court's abstention is, as with *Pullman* abstention, to determine whether resolution of the federal question is necessary or to obviate the risk of a federal court's erroneous construction of state law, *see Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Temple of the Lost Sheep,* 930 F.2d at 183, the same plaintiff cannot reserve her federal claims where, as with *Younger* abstention, the purpose of abstention is to "give effect to the principle that state courts have the solemn responsibility, equally with the federal courts to guard, enforce, and protect every right granted or secured by the Constitution of the United States." *Temple of the Lost Sheep,* 930 F.2d at 183 (citing *Steffel v. Thompson,* 415 U.S.

S.Ct. 149; *Feldman,* 460 U.S. 462, 103 S.Ct. 1303; *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 137–38 (2d Cir.1997); *Gentner v. Shulman,* 55 F.3d 87, 89 (2d Cir.1995). A plaintiff, however, can "still bring in federal district court a general challenge to a state rule, unless the issues raised were 'inextricably intertwined' with those resolved in the state judgment against the individual." *Distajo,* 107 F.3d at 137 (internal citations omitted). Our Court of Appeals has interpreted "inextricably intertwined" to mean, "at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding), subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion." *Moccio,* 95 F.3d at 199–200.

■■ The law of preclusion is, of course, divided into two branches: *res judicata* and collateral estoppel. *See Moccio,* 95 F.3d at 200. Although *res judicata* does not bar a § 1983 action where the plaintiff has previously brought an Article 78 proceeding, *see Colon v. Coughlin,* 58 F.3d 865, 870 n. 3 (2d Cir.1995), collateral estoppel does apply to § 1983 actions. *See Moccio,* 95 F.3d at 200; *Giakoumelos v. Coughlin,* 88 F.3d 56, 58 (2d Cir.1996). Under New York law, collateral estoppel will apply only if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. *See Moccio,* 95 F.3d at 200; *Colon,* 58 F.3d at 869.

Plaintiff, in her Article 78 notice of petition, alleges hat she was denied a fair hearing in violation of due process. It does not appear from the record that the issues relevant to plaintiff's First Amendment claims were raised in, or necessarily or actually decided by, the state court. I accordingly

find that the *Rooker–Feldman* doctrine does not bar plaintiff's First Amendment claims.

### B. *Official Policy or Custom*

■ It is well established that in order to sustain a claim for relief under 42 U.S.C. § 1983 against a municipal defendant, the plaintiff must show the existence of an officially adopted policy or custom that caused injury and a causal connection between that policy or custom and the deprivation of a constitutional right. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Walker v. City of New York,* 974 F.2d 293, 301 (2d Cir.1992). Thus, Szoke, in order to sustain her section 1983 claim against the County, must not only show the existence of a policy, custom or practice that caused her termination, but also a causal connection between that policy and the allegedly retaliatory termination.

The Court's review of plaintiff's memoranda in opposition to defendant's motion to dismiss, the supporting affidavits and the pleadings in this case reveals no admissible evidence, see Fed.R.Civ.P. 56(e) that supports a finding of policy, custom, or practice on the part of the County to retaliate against "whistle blowers," as plaintiff contends. Accordingly, defendant's motion to dismiss the First Amendment claims against the County is granted.

### C. *First Amendment*

■ Government employees have a right under the First Amendment: to speak on matters of public concern. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.

452, 460–61, 94 S.Ct. 1209, 1216–17, 39 L.Ed.2d 505 (1974)); *see Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). That same principle underlies the *Rooker–Feldman* doctrine. *See Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1142 (2d Cir.1986); *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). If a plaintiff could avoid the preclusive effects of a

state court proceeding simply by announcing her intent to reserve her federal claims, federal courts would fail to give effect to the ability of state courts to resolve federal constitutional questions and would thereby undermine one of key principles animating the *Rooker–Feldman* doctrine.

1996). That right, however, is not unlimited. *See Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90; *Sheppard*, 94 F.3d at 827; *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir.1996); *Jeffries v. Harleston*, 52 F.3d 9, 12 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995); *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993). Indeed, the Supreme Court has recognized that a public employer has "a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general." *Piesco v. City of New York*, 933 F.2d 1149, 1155 (2d Cir.1991) (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35). In order to be afforded protection, the employee's speech "must be on a matter of public concern, and [her] interest in expressing [herself] on this matter must not be outweighed by any injury the speech could cause to the 'interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35); *see Frank*, 1 F.3d at 1328; *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993).

Our Court of Appeals, in applying this balancing test, has instructed that a public employee who claims to have been disciplined for the exercise of her First Amendment rights must establish two elements: (1) that the speech can "fairly be characterized as constituting a matter of public concern," *Frank*, 1 F.3d at 1328; *see Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90, and (2) that the speech was "at least a substantial or motivating factor in the employer's adverse employment action." *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 780 (2d Cir.1991); *see Sheppard*, 94 F.3d at 827; *Frank*, 1 F.3d at 1328.

■ A government official may, nonetheless, in certain circumstances, "fire an employee for speaking—even on a matter of public concern—where that speech has the potential to disrupt the work environment." *Sheppard*, 94 F.3d at 827. Termination will not violate the employee's First Amendment rights where: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech. *Sheppard*, 94 F.3d at 827.

■ The threshold question of whether an employee's speech addresses a matter of public concern is an issue of law to be "determined by the content, form and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690; *see Frank*, 1 F.3d at 1328; *Ezekwo*, 940 F.2d at 781. Speech will fairly be characterized as touching on a matter of public concern if it "relate[s] to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690; *Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir.1994). When a public employee speaks "as an employee upon matters only of personal interest ... federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690; *Ezekwo*, 940 F.2d at 781. "The mere fact that a public employee chooses to discuss privately [her] concerns with [her] employer as opposed to expressing [her] views publicly does not alter the analysis." *Ezekwo*, 940 F.2d at 781. Issues that have been held to touch upon matters of public concern protected by the First Amendment include public institutional policies, the integrity of governmental entities, breaches of the public trust, and the expenditure of public funds. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (statement by employee of prosecutor's office about federal policies and an assassination attempt on the U.S. President); *Bernheim*, 79 F.3d at 325 (statements by school teacher regarding quality of education provided by public schools); *Frank*, 1 F.3d at 1329–30 (statement by victim-witness coordinator in prosecutor's office about suppression of exculpatory material); *Bieluch v. Sullivan*, 999 F.2d 666, 671 (2d Cir.1993) (police officer's public views about taxes, school budgets, and public

construction projects); *Piesco*, 933 F.2d at 1157 (testimony before legislative committee about police exam); *Vasbinder v. Ambach*, 926 F.2d 1333, 1341 (2d Cir.1991) (allegation to FBI of fraudulent overbilling in federally funded program), *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 46–47 (2d Cir. 1983) (allegations of corruption in agency). The determinative question in the Court's inquiry "is whether the interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee." *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir.1994).

▄▄▄▄ Here, plaintiff contends that she was terminated in retaliation for expressing her opinion regarding the operation and safety of the Laboratory. Although the record indicates that Szoke's complaints were at least partially motivated by her belief that her own health was being jeopardized by the Laboratory conditions, "the fact that an employee has a personal interest in certain speech ... does not necessarily disqualify that speech from First Amendment protection." *Wise v. New York City Police Dep't*, 928 F.Supp. 355, 372 (S.D.N.Y.1996). Moreover, plaintiff's correspondence to her supervisors indicates that her complaints were not strictly personal in nature. For example, memoranda to NYMC and WCMC personnel articulate her concern that high temperatures in the Laboratory caused noxious chemicals to evaporate and create fumes at an escalated rate, thereby impairing the health of other Laboratory personnel. Her September 1992 memorandum to Corbett further details potential problems with the

Laboratory's preparation and handling of specimens which plaintiff believed would not only decrease the efficiency of the Laboratory but would also increase the "probability of inadequate non-GYN screens." Szoke asserts that these environmental and procedural conditions created a substantial risk that patients would be misdiagnosed. I find that these concerns, which extend beyond matters that are of strictly personal interest, can "fairly be characterized as constituting matter[s] of public concern." [5] *Frank*, 1 F.3d at 1328.

▄▄▄▄ Further, the issue of Sweet's motivation—the second element of plaintiff's prima facie case of retaliation—is one that involves disputed questions of fact. The evidence supporting Sweet's involvement in the allegedly retaliatory disciplinary charges is largely limited to the fact that Sweet, after receiving plaintiff's September 1992 letter criticizing the conditions at the Laboratory, prepared and submitted the draft decisions on plaintiff's disciplinary charges to Carter. Carter, in turn, approved and signed those decisions, which resulted in Szoke's suspension and ultimate dismissal.[6] Our Court of Appeals has held that a causal connection between a protected activity and an adverse employment action can be established indirectly through such circumstantial evidence, that is by showing that the protected activity was followed by discriminatory treatment. *See Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir.1990). Szoke's argument that the disciplinary charges

---

5. Defendants also contend that because NYMC is not a governmental agency, complaints about its Laboratory's policies "cannot be deemed public speech in the context of a First Amendment retaliation claim." Defendants argue, in essence, that plaintiff's complaints about a private laboratory's policies do not qualify as "public speech." This Court's review of the case law emanating from both the Supreme Court and our Court of Appeals reveals no such qualification on a public employee's First Amendment right to speak, as long as the speech involves a matter of political, social or other concern to the community. *See Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90. Indeed, where the subject of criticism involves a nongovernmental entity, but nonetheless touches upon a matter of such concern, the state's interest in the efficient performance of its

public services—the rationale for allowing more extensive regulation of the governmental employee's speech—would less likely be implicated.

6. Plaintiff also submits, as evidence of Sweet's retaliatory motive, that some time during the summer of 1992, Sweet met with her and "suggested that she resign. When plaintiff refused to resign because it would be an effective admission of guilt, Sweet stated 'I hope that you realize the consequences of your decision.'" There is, however, no evidence that, at the time of that conversation, Sweet knew of Szoke's complaints about the health and safety conditions at the Laboratory. Accordingly, no causal connection can be drawn between Sweet's statements and his alleged retaliatory intent.

were retaliatory is supported by Sweet's testimony that the WCMC rarely drafted disciplinary charges, such as those issued against the plaintiff, which included a provision for suspension without pay. Though the defendants contend that plaintiff was terminated because of her repeated insubordination, "on a motion for summary judgment, the court is not to weigh the evidence or ... resolve issues of fact, but only to determine whether there are issues to be tried." *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994). I find that Szoke has made a sufficient showing of disputed fact to defeat summary judgment.

### D. *Qualified Immunity*

 Sweet contends that he is entitled to qualified immunity from suit insofar as he has been sued in his individual capacity. In general, public officials are entitled to qualified immunity if their conduct does not violate constitutional rights that were clearly established at the time the alleged violation occurred. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir.1996); *Lennon v. Miller,* 66 F.3d 416 (2d Cir.1995); *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). Even when a plaintiff's federal rights are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights. *Kaminsky,* 929 F.2d at 925; *see Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Weyant,* 101 F.3d at 857.

 Summary judgment will be granted on qualified immunity grounds, if "the only conclusion a rational jury could reach is that reasonable [officials] would disagree about the legality of the defendants' conduct under the circumstances." *Lennon,* 66 F.3d at 420. Moreover, "in the context of a summary judgment motion, [the Court] also must view the record most favorably to [Szoke], as the party opposing the motion, and 'accept [her] account of the reasons for [her] dismissal.'"

*Piesco,* 933 F.2d at 1160 (quoting *Giacalone v. Abrams,* 850 F.2d 79, 85 (2d Cir.1988)).

At the time of the events underlying plaintiff's claims, it was clearly established that a public employee retains First Amendment rights and generally may not be discharged for the exercise of those rights. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *see also Rankin,* 483 U.S. at 383–84, 107 S.Ct. at 2896–97; *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983); *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977). Determination of whether the defendants' actions were objectively reasonable, despite the clear definition of plaintiff's federal rights, requires the application of the "fact-sensitive *Connick–Pickering* balancing test." *DiMarco,* 952 F.2d at 666. Because facts material to this inquiry, namely the factual question as to the motivation behind Sweet's actions, are in dispute, the Court cannot make a qualified immunity determination at this time. *See Lennon,* 66 F.3d at 420 (use of the "objective reasonableness" test enables courts to decide qualified immunity claims as a matter of law when there are no material issues of disputed fact); *see also DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.,* 952 F.2d 661, 666 (2d Cir.1992).

### E. *Motion to Disqualify Plaintiff's Attorney*

 Defendant Jeffrey Sweet, citing Canon 4 of the A.B.A. Code of Professional Responsibility, moves to disqualify plaintiff's attorney, Jonathan Lovett, on the ground that between 1979 and 1982, Lovett, as then Deputy County Attorney of Westchester, "instructed and advised the defendant, Jeffrey Sweet, as an employee of the County of Westchester, in connection with the institution, development and finalization of approximately 150 disciplinary proceedings at the Westchester County Medical Center." Canon 4, on which Sweet bases his motion to disqualify, provides that "[a] lawyer should preserve the confidences and secrets of a client." To ensure adherence to this principle, "an attorney may be disqualified from

representing a client in a particular case if (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to relevant privileged information in the course of his prior representation of the client." *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983).

It is well established in this Circuit that "[m]otions to disqualify are generally disfavored. Such motions are often made for tactical reasons, may result in unnecessary delay, and interfere with a party's right to employ counsel of its choice. For these reasons, a high standard of proof is required for those seeking disqualification." *Cohen v. Acorn Int'l Ltd.*, 921 F.Supp. 1062, 1063–64 (S.D.N.Y.1995). Sweet's application implicates each of the concerns identified in *Cohen.*

The timing of Sweet's motion to disqualify, filed twenty-two months after the commencement of the action, raises serious questions as to the motives behind the motion, as Sweet should have been aware, at the time the action was filed, of allegedly confidential information to which Lovett may have had access. Sweet provides no explanation as to why now, after the completion of discovery and two rounds of dispositive motions, he moves for disqualification.

■ Moreover, it is far from clear that Lovett's prior "representation" of Sweet is "substantially related" to the present litigation. Disqualification will ordinarily be required where the subject matter of a later suit is sufficiently related to the scope of matters of the counsel's prior representation so as to "create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant." *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 750 (2d Cir.1981). Sweet responds by claiming that Lovett is "in possession of confidential information about legal analyses and strategies relating to the institution, development and finalization of disciplinary proceedings at the Medical Cen-

ter." That information, according to Sweet, is relevant to issues raised in this lawsuit, namely, whether Sweet wrongfully instituted, developed, and finalized two disciplinary proceedings against Szoke.

Sweet's generalized characterization of the matters raised in this action oversimplifies the issues raised in plaintiff's complaint. Plaintiff's remaining claims do not in any way challenge the strategies or analyses behind the defendants' decision to discipline and ultimately terminate Szoke. Rather, the issues that remain are highly fact intensive inquiries that are unique to this particular case, including, for example, whether plaintiff's speech was a motivating factor in the decision to terminate the plaintiff. I find that Sweet fails to satisfy his considerable burden of demonstrating that Lovett's access to that allegedly confidential information—almost ten years before the incidents underlying the present action—is substantially related to plaintiff's claim that defendants violated Szoke's First Amendment rights. Sweet's motion to disqualify is, accordingly, denied.

## F. *Sanctions*

■ Plaintiff urges the Court to impose sanctions on defendant Sweet and his counsel for seeking the disqualification of plaintiff's counsel. Even if the Court were to agree that Rule 11 provided a basis for sanctioning Sweet's counsel for filing the motion to disqualify, plaintiff's motion for sanctions necessarily fails because plaintiff has not complied with Rule 11's procedural requirements.

■ Rule 11 provides that the movant must wait twenty-one days after service of the motion upon his adversary to file the motion with the Court. Fed.R.Civ.P. 11(c)(1)(A). The purpose of the procedural requirements is to "provide a type of 'safe harbor' against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation." Advisory Committee Note on 1993 Amendment to Fed. R.Civ.P. 11. These procedural requirements

are construed strictly. *See, e.g., Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir.1995).

Although the date that plaintiff's motion for sanctions was served does not appear in the record, the Court presumes that it was served at the earliest on December 17, 1996, the date that the moving papers were signed by plaintiff's attorney. The motion for sanctions was filed on December 23, 1996, well within the twenty-one day "safe harbor" period. Because the plaintiff failed to comply with Rule 11's procedural requirements, the Court denies the motion for sanctions without reaching its merits. *See, e.g., Sartini v. Portofino Sun Center Columbus Ave. Corp.*, No. 96 Civ. 4550(JFK), 1997 WL 400209, at *4 (S.D.N.Y. July 16, 1997); *Bellistri v. United States*, No. 94 Civ. 3768(KMW), 1997 WL 115545, at *3 (S.D.N.Y. Mar.14, 1997).

**CONCLUSION**

For the reasons stated above, defendants motion for summary judgment is granted in part and denied in part. Defendant Sweet's motion to disqualify plaintiff's attorney and plaintiff's cross-motion for Rule 11 sanctions are denied. The parties are directed to file pretrial papers with the Court by September 15, 1997 and appear for a final pretrial conference on September 18, 1997 at 9:00 am.

**SO ORDERED.**