William BIRMINGHAM, Plaintiff,

v.

Louis C. OGDEN, individually, and The City of Middletown, New York, Defendants.

No. 97 Civ. 8057(CM).

United States District Court, S.D. New York.

Oct. 8, 1999.

Jonathan Lovett, Lovett & Gould, White Plains, NY, for William Birmingham, plaintiff.

William K. Kerrigan, MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, NY, for Louis C. Ogden, defendant.

Robert N. Isseks, Middletown, NY, for City of Middletown, New York, defendant.

MEMORANDUM DECISION DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S DUE PROCESS CLAIM, GRANTING DEFENDANT CITY'S *MONELL* MOTION, DENYING DEFENDANT OGDEN'S REQUEST FOR QUALIFIED IMMUNITY, DECLINING TO EXERCISE JURISDICTION OVER PLAINTIFF'S CLAIM PURSUANT TO ARTICLE 78 OF THE NEW YORK CIVIL PRACTICE LAW AND RULES, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S REMAINING CLAIMS

McMAHON, District Judge.

In *Moccio v. Office of Court Administration*, 95 F.3d 195 (2d Cir.1996), the United States Court of Appeals for the Second Circuit applied the so-called Rook-

er–Feldman doctrine,[1] which bars a district court from entertaining a suit that would have the effect of reversing or modifying a state court judgment, to sustain dismissal of a complaint that charged constitutional infirmities in the dismissal of a uniformed court officer. The plaintiff in *Moccio* was dismissed following a hearing at which he presented testimony and confronted the witnesses against him. An administrative law judge reviewed the record and sustained the hearing officer's recommendation of dismissal. The dismissed officer then brought a petition pursuant to Article 78 of New York's Civil Practice Law and Rules, seeking to vacate the decision of the administrative law judge. When the Article 78 appeal proved unsuccessful, Moccio brought an action in this court, pursuant to 42 U.S.C. § 1983, contending that his termination was procured in violation of his constitutional rights. The Second Circuit affirmed the district court's dismissal of Moccio's complaint for lack of subject matter jurisdiction. It ruled that Rooker–Feldman precluded plaintiff's suit, because plaintiff could have litigated his constitutional claims in the Article 78 proceeding but failed to do so. The Court held that the constitutionality of plaintiff's dismissal was necessarily comprehended in the state court's judgment upholding that dismissal, and that Moccio's constitutional claims were therefore "inextricably intertwined" with the validity of the underlying judgment in the Article 78 proceeding. This precluded the federal courts from entertaining them under Rooker–Feldman because, if the federal court found in the plaintiff's favor on his constitutional claims, the effect would be to reverse or modify the state court's judg-ment. That, of course, is what the *Rooker* and *Feldman* cases forbid.[2] *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

In this action, plaintiff William Birmingham is similarly aggrieved. He was dismissed from his position with the City of Middletown police force after a hearing conducted by the Middletown Board of Police Commissioners. At that proceeding, he was represented by counsel, who called and cross-examined witnesses. Like Moccio, Birmingham does not challenge the constitutionality of either law or regulations that were applied to him, but rather contends that those precepts were erroneously applied to his specific set of facts, by persons he claims were biased and acting out of a desire to retaliate against him for engaging in constitutionally protected speech. Like Moccio, Birmingham contends (among other things) that his dismissal violated Fourteenth Amendment due process guarantees, because the termination hearing was conducted in an arbitrary and capricious fashion. Also like Moccio, Birmingham alleges that he was selectively sanctioned by his superiors in violation of the Equal Protection Clause, in that other members of the Middletown police force were not disciplined or terminated for misconduct similar to his. Birmingham claims, additionally, that disciplinary charges were brought against him in retaliation for his exercise of his First Amendment rights to speak about matters concerning the operation of the Middletown police department.

1. See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

2. Moccio did not challenge the constitutionality of the law governing his dismissal, but rather the application of that law to his particular situation. Rooker–Feldman does not prevent federal courts from considering challenges to the constitutionality of a law, as opposed to the constitutionality of the way that it was applied in a particular instance. *See Feldman*, 460 U.S. at 486, 103 S.Ct. 1303. The former does not challenge the judgment of a state court, but rather a legislative or administrative determination, and therefore 28 U.S.C. § 1257 is not offended. *See id.*

For purposes of this motion, the critical difference between Birmingham's case and Moccio's is that plaintiff Birmingham, unlike Moccio, never bothered to bring an Article 78 proceeding challenging his dismissal. In such a proceeding, Birmingham could have litigated his constitutional claims. New York Civil Service Law § 76(1); *see Star Distrib., Ltd. v. Marino,* 613 F.2d 4, 8 n. 10 (2d Cir.1980) (noting the obligation and competence of state courts to decide federal questions); *see also Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (observing that State courts, as much as federal courts, are bound by and required to follow the United States Constitution).

The defendants have moved for summary judgment dismissing the instant complaint on a variety of grounds. Foremost among them is that this Court lacks subject matter jurisdiction under Rooker–Feldman. Defendants acknowledge that no State court judgment underlies this action. Nonetheless, they contend that Rooker–Feldman can and should be applied to the quasi-judicial State administrative proceeding, because that proceeding has collateral estoppel effects under New York law. The defendants claim that this conclusion is compelled by *Moccio,* where the plaintiff was (in essence) estopped from litigating claims in federal court that he had a full and fair opportunity to raise in a state court proceeding. In addition, defendants urge dismissal because plaintiff has failed to raise disputed issues of material fact as to each of his claims.

As I am required to resolve a challenge to this Court's subject matter jurisdiction prior to considering any other question, *see Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir. 1990) (stating that district courts should address a Rule 12(b)(1) challenge first, since if the court must dismiss the complaint for lack of subject matter jurisdiction, the accompanying objections become moot and need not be determined); *Mos-*

*ley v. Cozby,* 813 F.2d 659, 660 (5th Cir. 1987) (noting that before addressing the merits of any claim, a federal court must examine the basis of federal jurisdiction), I begin by addressing defendant's Rooker–Feldman argument. While I find that I am not compelled by Rooker–Feldman to abstain from hearing plaintiff's claims, I conclude that I must dismiss portions of the complaint on other grounds.

### Background Facts

The following facts, which are viewed most favorably to plaintiff, are deemed accepted for purposes of this motion only.

William Birmingham was a lieutenant on the City of Middletown police force. He was, by the admission of his Police Chief, defendant Ogden, an excellent officer during his tenure with the department. As a tenured municipal employee, Birmingham had a property interest in his position.

During his employment, at times and in places that are not specified in the complaint or in any evidentiary form, plaintiff expressed to Ogden, his friend, former partner and captain, various opinions concerning the running of the police department, including his opinion that the workings of the department were permeated with local politics and that the Police Chief was too closely tied to the Mayor. Plaintiff was also extremely active in the Police Benevolent's Association ("PBA"), and he criticized the leadership of the police department for not encouraging union activity among the rank and file. It would appear from the papers before me that Birmingham did not make these comments in any public forum, but instead privately, to Ogden or other senior officers of the department. It would be fair to infer that plaintiff developed something of a reputation as a troublemaker.

Plaintiff contends that his outspokenness on these matters, which he characterizes as matters of public concern, led his former friend Ogden to express an interest in "shutting his mouth." To accomplish this, plaintiff alleges that Ogden and two

confidantes, Lieutenants Joseph Valentia and Lawrence Corkey, coerced plaintiff's wife—with whom he was negotiating the terms of an unfriendly divorce—into filing a false criminal complaint against Birmingham. Plaintiff contends that his wife, who was ill and heavily medicated, was unable to comprehend what she was doing when she signed this charge, though he also alleges that his wife attempted to gain some advantage in their divorce negotiations by threatening to cause Birmingham trouble with his boss. On October 12, 1995, based on his wife's criminal complaint, plaintiff was arrested at his home and charged with assault in the third degree. Plaintiff's wife has since recanted her charge; she has testified, at plaintiff's disciplinary hearing, that she does not believe she was intentionally struck by her husband and was unaware of what she was assenting to when she signed the complaint. *See* Transcript of May 30, 1997 Board of Police Commissioners Hearing, attached as Ex. 13 to the Affidavit of Kim Berg, at 24–25, 29, 32, 52. The criminal action against plaintiff was eventually dismissed.

Over a year after this incident, but prior to dismissal of the criminal complaint, Police Chief Ogden brought plaintiff up on disciplinary charges based on the alleged domestic abuse. Plaintiff appeared before the Board of Police Commissioners, in May 1997, and was adjudged guilty of misconduct after an Article 75 disciplinary hearing that plaintiff contends was rigged against him and conducted in violation of his rights and the rules governing such proceedings. Among other things, plaintiff alleges that a series of *ex parte* contacts between Chief Ogden and certain members of the Board of Commissioners, and between Board members and the prosecutor, should have led three of the

Board members (the three who voted against him) to recuse themselves. He alleges that the Commissioners made their decision based on evidence they learned outside the hearing, and contends that the meeting at which the final vote was taken was deliberately scheduled for a time when his two supporters among the five Board members could not be present—although plaintiff does not explain how their presence would have helped his cause, since he believes that three of the five Board members were determined to discharge him from the outset of the proceeding. Those three did indeed vote to discharge Birmingham, and plaintiff was dismissed from the police force effective July 18, 1997.

Plaintiff had two avenues of appeal under state law from the adverse administrative determination. He could have appealed to the Civil Service Commission, pursuant to New York Civil Service Law § 76(1). Or, he could have commenced an Article 78 proceeding in the Supreme Court, Orange County, to determine whether the decision of the Board members was supported by substantial evidence.[3] He did neither. Instead, Birmingham retained counsel and filed the instant action in federal court.

Plaintiff brings several claims, pursuant to 42 U.S.C. § 1983, alleging violations of his federal constitutional rights under color of state law.[4] As his first and second causes of action, Birmingham asserts that the defendants' actions violated his rights to free speech and free association under the First Amendment. Complaint ¶¶ 28, 30. Plaintiff states that during his 20 years with the Middletown Police Department, he "consistently articulated to [defendant] Ogden" his feelings about two topics: one, that local politics were having a corrupting influence on the administra-

---

**3.** *See Scherbyn v. Wayne–Finger Lakes Bd. of Coop. Educ. Servs.,* 77 N.Y.2d 753, 757–58, 570 N.Y.S.2d 474, 477, 573 N.E.2d 562 (1991) (finding that Article 78 review of a quasi-judicial hearing is a certiorari proceeding, not a mandamus to review proceeding,

and therefore "substantial evidence" rather than "arbitrary and capricious" is the standard of review).

**4.** Plaintiff has voluntarily withdrawn claims made under 42 U.S.C. § 1985.

tion of the police department, and two, that participation by members of the police department in the Police Benevolents Association (PBA) should be encouraged by the leadership of the department. Complaint ¶ 6. Plaintiff believes that Chief Ogden held the opposite views with respect to both topics—i.e., that Ogden thought that "[s]worn members of the Department should be grateful to their local elected politicians[,] whose influence in the administration should be countenanced," and that "exercise of associational rights by members of the PBA, including Plaintiff, should be suppressed and not encouraged since the associational activities of the PBA membership were not in the best interest of the City." Complaint ¶ 7. Plaintiff's claim is that, because he held views that were disfavored by Chief Ogden and certain members of the Board of Police Commissioners (namely, the Mayor, who was both President of the Board and the main target of plaintiff's allegations of political corruption), the Chief and the Mayor preferred disciplinary charges against him, put him through a sham disciplinary hearing and procured his dismissal—all to retaliate against him and "shut [his] mouth" about these topics.

As his third claim, plaintiff alleges a violation of his due process rights under the Fourteenth Amendment. Complaint ¶ 32. Plaintiff alleges that his termination was unlawful because the Board was without sufficient evidence to remove him from the force and because it made the decision to remove him based on information learned outside the record at the hearing. Plaintiff claims that certain police officers, including defendant Ogden, perjured themselves at the disciplinary hearing, and that Ogden had several *ex parte* discussions with the Mayor (which the Mayor then relayed to his "cronies" on the Board) about Birmingham and the disciplinary charges against him. Complaint at ¶ 18; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Brief"), at 20. Plaintiff also alleges that defendant Ogden

and the Mayor arranged, after the hearing, to have the hearing stenographic record altered so as to protect themselves from perjury charges. Complaint ¶ 18. Plaintiff further complains that the process used to render a determination in his case violated lawful procedures. Plaintiff's Brief at 32. Specifically, plaintiff's complaint states that he was "pre-judged by a three-to-two split ... to be guilty," and that Chief Ogden and the Mayor deliberately stalled the final vote on dismissal until a time when the two members of the Commission who would not vote to terminate plaintiff were not available. Complaint ¶¶ 19, 20. The three members of the Board who were present at the meeting then "convicted Plaintiff and summarily terminated his employment." Complaint ¶ 21.

Plaintiff's fourth claim is that the defendants' conduct violated his right to Equal Protection under the Fourteenth Amendment because he was subjected to a disciplinary hearing and terminated from employment while other officers on the force who had engaged in misconduct were not required to undergo a hearing or terminated for that misconduct. Plaintiff alleges that other Middletown police officers have gone undisciplined for acts of misconduct that have brought discredit to the police department, such as harassment or drunkenness. Plaintiff's Brief at 37–38. Plaintiff also notes that he is aware that at least one other police officer was disciplined after an accusation by his wife that he assaulted her, but that officer was not put through a disciplinary hearing and was suspended for two weeks rather than terminated. Plaintiff's Brief at 37. Plaintiff, in fact, alleges that *no* other disciplinary hearings pursuant to Section 75 of the New York Civil Service Law have been held against members of the Middletown Police Department since 1986, and that only one other hearing was held by the Board of Police Commissioners since approximately 1975. Plaintiff's Brief at 39.

As his fifth claim, Plaintiff has asserted that the actions of the defendants were "arbitrary, capricious, and/or otherwise unlawful in violation of Plaintiff's state law entitlements to a fair hearing" and that "the disciplinary hearing and/or conviction must be declared null and void." Complaint ¶¶ 37–38. Plaintiff describes this as a supplemental state law claim. Of course, what he is doing is asking this court to conduct an Article 78 review of the hearing held by the Board of Police Commissioners.

## Discussion

### 1. The Rooker–Feldman Issue ·

■ The essence of the Rooker–Feldman doctrine is that the federal district courts have no authority to review final judgments of state courts in judicial proceedings. *Narey v. Dean*, 32 F.3d 1521, 1524 (11th Cir.1994). Appellate review of state court judgments is available only in the Supreme Court. 28 U.S.C. § 1257; *Van Harken v. City of Chicago*, 103 F.3d 1346, 1349 (7th Cir.1997). Under the Rooker–Feldman doctrine, a district court is without subject matter jurisdiction if a federal claim is "inextricably intertwined" with a state court judgment. *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303. A federal claim is "inextricably intertwined" with the underlying judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). The Second Circuit has interpreted "inextricably intertwined" to be co-extensive with the law of preclusion. *Moccio* at 199–200. Thus, "where a federal plaintiff had an opportunity to litigate a claim in a state proceeding (as either the plaintiff or defendant in that proceeding), subsequent litigation of the claim will be barred under the Rooker–Feldman doctrine if it would be barred under the principles of preclusion." *Id.* at 199 (citations omitted).

Applying that logic to the facts in the *Moccio* case, the Second Circuit concluded as follows: a plaintiff who had availed himself of a state forum (i.e., an Article 78 proceeding), where constitutional challenges to the fact-specific application of a state law or regulation to an aggrieved litigant could be considered, could not fail to litigate those constitutional issues in the state forum and then expect to maintain a lawsuit for damages in a federal district court. The Court then found that issues essential to both Moccio's causes of action under § 1983 were actually and necessarily decided adversely to him in the Article 78 proceeding, so that any inquiry into matters comprehended within the Article 78 judgment would run afoul of the rule forbidding federal courts from making determinations that undermine the validity of a state court judgment.

■ Here, of course, plaintiff has sidestepped state court review of the administrative determination altogether. Without availing himself of either of the two forms of state court appeal that lay from the ruling against him (an Article 78 or an appeal to the Civil Service Commission), he has commenced this federal court action for damages. Plaintiff maintains that he is not compelled to take advantage of available State law remedies and can come directly to federal court with both his constitutional claims and his request that the determination of the Police Commissioners—and his dismissal—be declared null and void.

Not so, say defendants. They point to the *Moccio* Court's application of preclusion law to determine whether Rooker–Feldman must be invoked. They argue, correctly, that the disciplinary proceeding that ended in plaintiff's termination was judicial in nature—i.e., it was a proceeding held to find facts and apply existing law and regulation to them, not to legislate new law and regulations. They note that Birmingham had the opportunity to be represented at the proceeding, to call witnesses and to cross examine those called

against him. Under New York law, facts found in such a quasi-judicial proceeding have collateral estoppel effect in future proceedings. *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 46 (2d Cir.1985); *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 496, 478 N.Y.S.2d 823, 825–26, 467 N.E.2d 487 (1984). Defendants reason, therefore, that Rooker–Feldman must apply to bar plaintiff's collateral federal attack on the results of the quasi-judicial administrative proceeding.

Defendants are wrong. While the New York courts have held that quasi-judicial administrative findings have collateral estoppel effect in state courts (and in fact the usual rule is that the same amount of collateral estoppel effect applies in the federal courts as would in the state courts), *see* 28 U.S.C. § 1738; *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), Rooker–Feldman simply is not implicated when no judgment of a state court is at issue. The three federal circuits that have already considered this precise question—in factual situations strongly reminiscent of those before me—have so held. *See Van Harken v. City of Chicago,* 103 F.3d 1346, 1348–49 (7th Cir.1997); *Narey v. Dean,* 32 F.3d 1521, 1525 (11th Cir.1994); *Scott v. Flowers,* 910 F.2d 201, 206 (5th Cir.1990).

In *Narey v. Dean,* the Eleventh Circuit held that the Rooker–Feldman doctrine did not apply to an unreviewed decision of the Georgia State Personnel Board. Plaintiff Narey was demoted from his position as director of the Northwest Georgia Community Mental Health Center after an audit and investigation suggested that he had, among other things, improperly handled client funds and misused state grant monies. Narey appealed his demotion to

the State Personnel Board. After a seven-day, quasi-judicial hearing on the matter, a hearing officer upheld the demotion decision. Narey subsequently appealed to the full Board, which affirmed.[5]

Narey then brought a § 1983 suit in federal district court, claiming that the Center's action violated his due process rights because the defendants had demoted him for pretextual reasons, had failed to satisfy the requirements of progressive discipline before demoting him, and were without legal authority to take the adverse action against him.[6] The district court took jurisdiction of the case, which was eventually tried to a jury.

On appeal, the defendants argued that the decision of the State Personnel Board upholding Narey's demotion barred the district court from hearing Narey's case under Rooker–Feldman. The Eleventh Circuit rejected this contention, stating, "If the decision of a state agency has been upheld by a state court, then the Rooker–Feldman doctrine applies, because a challenge to the agency's decision necessarily involves a challenge to the judgment of the state court. The 'effect of unreviewed state administrative decisions,' however, is a matter of res judicata, and is governed by the Supreme Court's decision in *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)." *Narey,* 32 F.3d at 1525 (citations omitted). *Elliott* had held that, if a state agency acting in a judicial capacity resolved disputed issues of fact that were properly before it, at a hearing where the parties had an adequate opportunity to litigate disputed issues, then its factual findings should be given preclusive effect in a subsequent § 1983 action. *Elliott,* 478 U.S. at 797–98, 106 S.Ct. 3220.[7] As the

---

**5.** He followed that appeal with a suit in Catoosa County Superior Court, which he later voluntarily dismissed without prejudice.

**6.** Narey also asserted a stated law claim for tortious interference with his contractual rights, which he later abandoned.

**7.** More specifically, the Court held that federal common-law rules of preclusion must be applied to the claim under § 1983, *University of Tennessee v. Elliott,* 478 U.S. 788, 797–99, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), but that plaintiff was entitled to a trial *de novo* in the federal courts on his Title VII claims. *Id.* at 799 fn. 7, 106 S.Ct. 3220.

*Narey* court recognized, if Rooker–Feldman—a jurisdictional doctrine—applied to state administrative adjudications, the Supreme Court would have raised the issue on its own motion and dismissed Elliott's case. *Narey* 32 F.3d at 1526 (*citing Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 740, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (observing that the Supreme Court must question the jurisdiction of the lower courts on its own motion)). The *Narey* court concluded, therefore, that any extension of Rooker–Feldman to state administrative determinations would be inconsistent with the Supreme Court's decision in *Elliott*.

In *Scott v. Flowers*, the Fifth Circuit took jurisdiction of a § 1983 claim by a Texas justice of the peace, who alleged that the Texas Commission on Judicial Conduct had reprimanded him in retaliation for writing an "open letter" criticizing the administration of the county judicial system. The court, on its own motion, considered whether Rooker–Feldman deprived it of jurisdiction over the determinations of the Commission on Judicial Conduct. After deciding that the Commission's reprimand of Scott qualified as a "judicial" act, the court determined that Rooker–Feldman did not apply to Scott's § 1983 action—regardless of whether a finding in Scott's favor would overrule the underlying administrative judgment.

The *Scott* court relied not on *Elliott*, but on another Supreme Court decision, *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In *Patsy*, the Supreme Court held that § 1983, the principle vehicle for challenging state action on federal grounds (and the one used by Birmingham in this action), contains no requirement of exhausting state judicial remedies. *Patsy*, 457 U.S. at 500, 516, 102 S.Ct. 2557. "The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)

(*quoted in Patsy*, 457 U.S. at 506, 102 S.Ct. 2557). Thus, a plaintiff asserting a § 1983 claim is allowed to choose either a state or a federal forum to have his constitutional claims heard. *Patsy*, 457 U.S. at 506, 102 S.Ct. 2557.

In so holding, the Fifth Circuit distinguished its own decision in *Thomas v. Kadish*, where it had applied Rooker–Feldman to bar an appeal in federal court from a determination of the Texas Board of Law Examiners. *Thomas* held that Rooker–Feldman *does* require a federal court to abstain from hearing claims inextricably intertwined with a judgment from a judicial type hearing if the administrative body was controlled by, or was an agent of, the state court system. *Thomas v. Kadish*, 748 F.2d 276, 278–80 (5th Cir. 1984). For example, in *Thomas*, the administrative body, the Texas Board of Law Examiners, was found to be "essentially the agent of the Texas Supreme Court, which had promulgated the rules governing the Board's activities and appointed the Board's nine members." *Scott*, 910 F.2d at 207. In *Scott*, by contrast, the administrative body was the Texas Commission on Judicial Conduct, which could not be regarded as an agent of the state court system because the Commission was constitutionally established and endowed with a measure of independence from the courts. *Id.* While the difference may seem insignificant, *Scott* illustrates the principle that only where the administrative body issuing the judgment is an agent of the state court system can it be said that the federal courts are sitting in review of a state court judgment, thereby triggering Rooker–Feldman's comity and federalism concerns.

To determine whether Rooker–Feldman applied, the *Thomas* and *Scott* courts examined both the membership of the particular administrative body as well as its functions, to determine whether it was independent from or controlled by the state court system. It is beyond dispute that the Middletown Board of Police Commis-

sioners is not controlled by and is not an agent of the New York State court system. None of its members are appointed by the State court system, and its functions have nothing to do with matters that relate to the operation of that system. Thus, the holding in *Thomas* would seem to have nothing to do with this case.

The Seventh Circuit, like the Fifth Circuit, relied on the non-exhaustion rule of *Patsy* to deny a Rooker–Feldman challenge to a § 1983 suit following administrative proceedings. In *Van Harken v. City of Chicago,* plaintiffs challenged the application to them of a new city system for the adjudication of parking violations. The City, arguing that plaintiff's due process claims waged collateral attacks on the underlying judgments (made by administrative hearing officers after contested proceedings), urged that Rooker–Feldman prevented the court from taking jurisdiction. Judge Posner, writing for the court, concluded that the City's argument "depend[ed] upon the undefended assumption that the [Rooker–Feldman] doctrine applies to administrative as well as judicial decisions." *Van Harken,* 103 F.3d at 1348. While "[i]t might appear . . . that a party to a state administrative proceeding is not authorized to bypass the appellate remedy that the state has provided in its own courts by filing an action in federal district court instead, countless cases . . . allow people who lose in state administrative proceedings to seek relief in federal court under civil rights legislation such as 42 U.S.C. § 1983[,] and *Patsy v. Board of Regents* expressly rejected a requirement

of exhausting administrative remedies before suing under that section." *Van Harken,* 103 F.3d at 1349 (citations omitted).[8] Judge Posner continued, "We cannot believe that these cases were decided as they were simply because the defendants failed to argue Rooker–Feldman. If the Rooker–Feldman doctrine is to be extended to administrative judgments, it will have to be done by the Court that created it." *Id.*

Under *Patsy* and its progeny, Birmingham cannot be compelled to seek state court review of the Board of Police Commissioner's determination before challenging that determination on constitutional grounds pursuant to § 1983. Birmingham has chosen to come here, to federal court, first. He has not engaged the state court system to resolve his claims,[9] and there has been no state court judgment. Therefore, Rooker–Feldman does not apply. Rooker–Feldman does not require that a plaintiff pursue all conceivable state remedies; it does not require that, where possible, he institute proceedings so that the state courts can consider his claims in the first instance—including his federal claims, which he would have to raise or waive. As the Second Circuit has written, "[i]t is a pillar of federal jurisdiction that one having a bona fide claim is normally entitled as a matter of right to have the claim adjudicated by a federal tribunal and that right may not be defeated by relegating the matter to the state court or by requiring the plaintiff to exhaust state remedies." *McRedmond v. Wilson,* 533 F.2d 757 (2d Cir.1976) (*quoting McNeese v.*

8. The court noted that plaintiffs' claims for a declaratory judgment that the new parking violation adjudication law was constitutionally inadequate were also not barred by Rooker–Feldman, because they did not challenge the judgment in any particular case. *See Van Harken v. City of Chicago,* 103 F.3d 1346, 1349 (11th Cir.1997) (citations omitted). Finally, however, the court applied Rooker–Feldman to bar the set of claims by plaintiffs seeking *refunds* of parking fines imposed upon them by the state courts after administrative findings of liability. *See id.*

9. If he had, the doctrine of *Younger* abstention would likely have required this court to abstain from hearing plaintiff's claims. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see also, e.g., Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 237–38, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) ("interests of comity and federalism counsel federal courts to abstain from jurisdiction whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests").

*Board of Educ. For Comm. Unit School Dist. 187,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963)). Exhaustion of state remedies is sometimes required, in effect, by the rule of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and its progeny, *see infra* 2c., but any general requirement of exhausting state judicial remedies before bringing a federal civil rights suit would severely interfere with the scheme intended by Congress when it enacted § 1983. Congress "imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." *McRedmond,* 533 F.2d at 759.

If I were to read *Moccio* as defendants urge, I would, in effect, be ruling that the Second Circuit overruled *Patsy* and *Elliot.* Obviously, the Second Circuit did nothing of the sort. This court will not do so either. Defendants assert, alternatively, that Birmingham's claims simply do not raise a federal issue and are masquerading as federal claims when they ultimately seek nothing more than that the defendants be forced to give plaintiff his job back.[10] I cannot agree with the defendants, and must give this plaintiff's claims the same consideration as I am bound to give any claims over which I have jurisdiction. Plaintiff's claims as pleaded must be tested on their merits.

Based on the reasoning of the Fifth, Seventh and Eleventh Circuits, which I find persuasive in light of the rulings of the United States Supreme Court, I am constrained to conclude that Rooker–Feldman does not bar federal court review of the quasi-judicial administrative determination of the Middletown Board of Police Commissioners. Review of administrative determinations will not ordinarily offend the principles of comity and finality that underlie the doctrine,[11] and the jurisdictional bar applicable when a state court judgment is involved is therefore not warranted.

Of course, the Supreme Court's determination that principles of collateral estoppel apply when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it after giving the parties an adequate opportunity to litigate, *Elliott,* 478 U.S. at 796, 106 S.Ct. 3220, applies in this § 1983 action. As the Supreme Court has noted, giving preclusive effect in federal courts to the fact finding of state administrative bodies acting in a judicial capacity serves both the value of enforcing repose, which underlies general principles of collateral estoppel, and the value of federalism. *Elliott,* 478 U.S. at 796–99, 106 S.Ct. 3220. However, defendants here concede that the constitutional issues were never litigated before the Board of Police Commissioners. *See* Defendants' Memorandum of Law at 18. Thus, plaintiff's claims are not subject to principles of former adjudication.

### Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.,* 369

---

**10.** Although they do not cite case law, defendants appear to be relying on the oft-stated principle that a plaintiff may not seek a reversal in federal court of a state court judgment simply by casting his complaint in the form of a civil rights action. *See, e.g., Davidson v. Garry,* 956 F.Supp. 265, 269 (E.D.N.Y.1996), *aff'd,* 1997 WL 225082 (2d Cir.1997); *Reed v. Terrell,* 759 F.2d 472, 473 (5th Cir.1985). Of course, this is simply another way of saying that collateral attacks on state court judgments are barred by Rooker–Feldman.

**11.** And if it does in a particular instance, other abstention or preclusion doctrines may be invoked by the federal courts.

U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir. 1987). To survive a motion for summary judgment, the party opposing it must set forth specific facts showing that there is a genuine issue for trial.

### 2a. Plaintiff's First Cause of Action

As his first cause of action, plaintiff contends that he was discharged in retaliation for exercising his First Amendment right to speak out (albeit only in private) on matters of public concern dealing with the administration of the Police Department in Middletown—in particular, its excessive entanglement with local politicians and its lack of commitment to a strong police union. Defendants' motion for summary judgment as to this claim is denied.

 Public employees have a right under the First Amendment to speak on matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996). To maintain an action for First Amendment retaliation, a plaintiff must show: (1) that his speech can fairly be characterized as constituting a matter of public concern, and (2) that the speech was at least a substantial and motivating factor in the employer's adverse employment action. *See Szoke v. Carter*, 974 F.Supp. 360, 367 (S.D.N.Y.1997) (*citing Connick*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Sheppard*, 94 F.3d at 827; *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993)).

 Defendants contend that they are entitled to summary judgment on this claim because (1) plaintiff's speech was not on any matter of public concern; (2) even if it was on matters of public concern, plaintiff has not demonstrated any nexus between his speech and the commencement of disciplinary proceedings against him. I turn first to defendant's contention

that plaintiff's speech, which concerned matters of departmental administration, did not touch on issues of public concern. This is purely a question of law, which the Court must decide. *Connick*, 461 U.S. 138, 148 fn. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

 Speech will fairly be characterized as touching on a matter of public concern if it "relate[s] to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684; *Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir.1994). Issues that have been held to touch upon matters of public concern protected by the First Amendment include public institutional policies, the integrity of governmental entities, breaches of the public trust, and the expenditure of public funds. *Szoke*, 974 F.Supp. at 367. Defendants correctly note that, when a public employee speaks "as an employee upon matters only of personal interest ... [,] federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684; *Ezekwo v. New York City Health and Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.1991). However, I must disagree with defendants' assessment that the substance of the speech at issue was only of personal interest to plaintiff and not of public concern. Allegations by a police lieutenant that his department's administration is too political, and not sufficiently independent of local political processes, are similar in nature to types of speech that have been held to be protected. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (statements by employee of prosecutor's office about federal policies); *Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir.1996) (statements by school teacher regarding quality of education provided by public schools); *Bieluch v. Sullivan*, 999 F.2d 666, 671 (2d Cir.1993) (police officer's public views about taxes, school

budgets, and public construction projects); *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 46–47 (2d Cir.1983) (allegations of corruption in agency).

■■■■■ It appears to be undisputed that plaintiff never uttered his allegedly offending opinions publicly. He expressed them to the Chief privately, or in conversations with other members of the police department. Plaintiff's Brief at 9–12, 14. However, plaintiff is correct that this does not remove his speech from the purview of the rule that public employees must be free to speak out on matters of public concern. "The mere fact that a public employee chooses to discuss privately his concerns with his employer as opposed to expressing his views publicly does not alter the analysis." *Szoke*, 974 F.Supp. at 367 (*quoting Ezekwo*, 940 F.2d at 781). Furthermore, "the fact that an employee has a personal interest in certain speech ... does not necessarily disqualify that speech from First Amendment protection." *Wise v. New York City Police Dep't.*, 928 F.Supp. 355, 372 (S.D.N.Y.1996). The determinative question in the Court's inquiry "is whether the interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee." *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir.1994). I conclude that some, if not all, of plaintiff's remarks about the workings of the police department can fairly be said to arise from the former, and plaintiff has, therefore, identified speech protected by the First Amendment.

■■■■ Next, plaintiff must proffer evidence tending to establish that there is a nexus between his speech and the action taken against him. Here, defendant appears to be on somewhat firmer ground. Plaintiff, with perhaps one exception, has not identified, by time and place and words spoken, instances in which he uttered the allegedly offending words to Ogden or in his presence. Instead, plaintiff simply avers that he spoke out on these matters continually during his tenure on the police force, both before and after he was pro-moted to the rank of lieutenant—a position for which Ogden recommended him. This distinguishes the instant case from those plaintiff cites in support of his claimed right to a trial. In each of those cases, the plaintiff could point to specific instances (date, time, place) and specific speech. In those cases, a rational juror could conclude, based on the timing of the adverse action vis-a-vis the allegedly offending speech, that the latter had induced the former. In this case, such an inference is more difficult to draw, because there is little evidence to tie any specific utterance with the decision to find some way to fire Birmingham. Moreover, the fact that Ogden actually recommended plaintiff for a promotion at a time when plaintiff admits he was outspoken about these matters militates against any such inference. Plaintiff suggests that he was promoted in an effort to turn him into a team player, but the only "evidence" he offers to support this conclusion is his own speculative musings. That, of course, will not suffice.

Even so, the Second Circuit has held that a causal connection between a protected activity and adverse employment action can be established indirectly, through circumstantial evidence, by showing that the protected activity was followed by discriminatory treatment. *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (*cited in Szoke*, 974 F.Supp. at 368). Birmingham's allegation that his disciplinary hearing and dismissal were retaliatory is supported by circumstantial evidence that defendants have not rebutted. First, plaintiff alleges that, in mid to late 1994 (among other times), he stated to Ogden his opinion that, as Police Chief, Ogden should exercise more control over managing the department (rather than allowing the Mayor to direct the operations of the department). Plaintiff's Brief at 9. Plaintiff then alleges that, beginning in late 1994 and throughout 1995, a series of things occurred that suggest retaliation for plaintiff's expressions. Plaintiff says that he was excluded from regular morning

**368**

meetings (in which he had previously been included) where input from supervisors, like the lieutenants, would be given. Plaintiff's Brief at 14. He claims he was also excluded, during this same time frame, from afternoon car rides with Chief Ogden and Bureau Commander/Lieutenant Corkey, during which "sensitive issues were discussed." Plaintiff's Brief at 15. Plaintiff alleges that Chief Ogden stopped talking to him, stopped issuing orders through him, and shunned plaintiff openly in front of others in the department. Plaintiff's Brief at 15. Furthermore, plaintiff alleges that, following a discussion with the Chief in his office regarding comments by plaintiff about another lieutenant's misconduct, Ogden remarked to the other officer, "Don't worry, I'll be shutting his mouth soon." Plaintiff's Brief at 17. Shortly thereafter, the allegedly trumped-up domestic abuse complaint was filed.

Defendants do not directly controvert these allegations. Defendants describe plaintiff's allegations as vague and conclusory, and contend that the department's preferral of disciplinary charges and dismissal of plaintiff from his job were justifiable actions taken based on Virginia Birmingham's allegation of domestic abuse and on the disrepute brought to the police department because of publicity surrounding the criminal complaint filed against plaintiff. Plaintiff, however, maintains that his wife's criminal complaint was procured by Chief Ogden and Lieutenants Corkey and Valencia at a time when she was drugged and confused, and that all three *knew* that she was unsure as to what had happened at the Birmingham home in the early morning hours of October 12.

Whether or not there was probable cause to bring an assault charge against plaintiff based on the alleged assault, or to subsequently file departmental disciplinary charges against him for misconduct, Virginia Birmingham's own testimony at plaintiff's disciplinary hearing supports his assertion that the charges were trumped up, and that the criminal assault charge

that ultimately lead to his dismissal was improperly made, at the hands of Chief Ogden. "On a motion for summary judgment, the court is not to weigh the evidence or ... resolve issues of fact, but only to determine whether there are issues to be tried." *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994). Viewing the evidence in the light most favorable to plaintiff, the record demonstrates that he has made a showing of disputed fact sufficient to defeat summary judgment.

**2b. Plaintiff's Second Cause of Action**

■ As his second cause of action, plaintiff alleges a violation of his right of association under the First Amendment. This claim must be dismissed.

Plaintiff is not asserting that the defendants' actions in bringing him before the Board of Police Commissioners or terminating his employment prevented him from associating with or even hindered his association with the PBA. Rather, the essence of plaintiff's second cause of action is that he was an active member of the PBA and advocated that the police department support or encourage PBA membership, and that based on that affiliation and expression of views, defendants retaliated against him by getting him fired.

Plaintiff may not maintain a separate claim for retaliation based on exercise of First Amendment associational rights. The type of association plaintiff describes, with respect to his affiliation with the PBA, is what might be termed "expressive" association. *See, e.g., Adler v. Pataki,* 185 F.3d 35, 42 (2d Cir.1999) (noting that the Supreme Court has recognized two types of association rights—"an individual's right to associate with others in intimate relationships, and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct"). Expressive association is considered a form of "speech," in the way that certain expressive conduct

has been held to constitute speech. *See, e.g., R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (holding that disorderly conduct ordinance censored expressive conduct and thereby violated the First Amendment); *Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (finding that black arm band worn by students to protest war was expressive conduct protected by the free speech clause of the First Amendment); *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (finding that peace sign attached to American flag was protected "speech" under the First Amendment). Plaintiff's expressive association with the PBA is protected by the First Amendment on that basis. Thus, the second cause of action is comprehended by the first, and must be dismissed as duplicative.

### 2c. Plaintiff's Third Cause of Action

As his third cause of action, plaintiff alleges a violation of his right to due process. Public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure, and cannot be fired without due process. *Gilbert v. Homar,* 520 U.S. 924, 927–28, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (*citing Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). Pre-termination notice and an opportunity to be heard, coupled with a full adversarial hearing after termination, satisfy the constitutional due process requirements for termination from public employment. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

Defendants do not dispute that Birmingham had a property interest in his position with the police department and could only be discharged for cause. Plaintiff does not dispute that defendants afforded him notice and an opportunity to be heard. In fact, they afforded him a pre-termination adversarial hearing. It is the conduct and results of that hearing that plaintiff challenge as violating his constitutional rights.

Plaintiff contends that the Board of Police Commissioners violated his due process rights in connection with the disciplinary hearing in the following ways: first, that the five-member Board made its determination based on evidence outside of the record at the hearing, including statements allegedly made by Chief Ogden to the Commissioners five months before the hearing that plaintiff's wife had also reported domestic abuse before the incident for which he was being charged, and that the department had not taken a firm stand but should do so this time; second, that the Mayor deliberately stalled the Commission's meeting and discussion of the matter after the hearing until it could be arranged that only the three Commissioners who would vote for termination could be present; third, that at that meeting the Mayor "cast his pre-determined vote along with [those of] his two political cronies and by unsigned determination ... this group of three convicted Plaintiff and summarily terminated his employment."

Plaintiff also alleges that Chief Ogden and certain of his subordinate officers (presumably at the Chief's direction) testified perjuriously at the hearing in order to provide the Board with evidence sufficient to justify a conviction and termination of plaintiff. Plaintiff further alleges that Ogden and Mayor DeStefano arranged to have the disciplinary hearing stenographic record altered "in at least two critical respects," though plaintiff does not specify what they are. Plaintiff has provided no evidentiary support for his musings that Chief Ogden or others lied, and that the Chief and the Mayor doctored the hearing transcript to cover up such lies.

However, plaintiff's factual allegations are irrelevant. Plaintiff has no claim for denial of due process because the availability of an Article 78 proceeding constitutes an adequate post-deprivation remedy for

any of the alleged due process violations, or for all of them taken together. *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996) *(citing Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)); *see also Marino v. Ameruso,* 837 F.2d 45 (2d Cir.1988).

The Supreme Court has drawn a distinction between due process claims based on established state procedures and claims based on random, unauthorized acts by state employees. *See Hudson,* 468 U.S. at 532, 104 S.Ct. 3194; *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). When the deprivation occurs in the more structured environment of established state procedures, rather than due to random acts, the availability of post-deprivation procedures (like Article 78 review) will not satisfy due process. *Hudson,* 468 U.S. at 532, 104 S.Ct. 3194; *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 435–36, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Plaintiff argues, in response to defendants' motion for summary judgment, that his termination was not the result of random or unauthorized actions by state actors, but rather a deprivation that occurred "in [the] more structured environment of a City or State procedure." Plaintiff's Brief at 50.

Plaintiff's factual allegations, however, do not support such an argument. Birmingham does not claim that the established state procedure for dismissing municipal employees violates due process. Rather, he claims that his hearing was conducted, and he was dismissed, in flagrant violation of the rules that should govern such proceedings and decisions. Assuming for the moment that Birmingham was deprived of his job without due process of law, that deprivation occurred because of random and arbitrary acts of Chief Ogden and certain of the Police Commissioners in ignoring matters of procedure. As such, his due process claim falls under the rule of *Parratt* and its progeny that random and unauthorized due process deprivations can be remedied via an Article 78 proceeding (or other, similar post-deprivation remedy). Birmingham's claim survives only if New York does not provide such a procedure. It does; his claim does not.

■ This Circuit has held that "an Article 78 proceeding is a perfectly adequate post-deprivation remedy . . . ." *Hellenic Am. Neighborhood Action Comm.,* 101 F.3d at 881; *see also Interboro Inst., Inc. v. Foley,* 985 F.2d 90, 93 (2d Cir.1993); *McDarby v. Dinkins,* 907 F.2d 1334, 1338 (2d Cir.1990); *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984). Furthermore, plaintiff, having failed to take advantage of this remedy, "can find little comfort in the general rule that § 1983 allows plaintiffs with federal or constitutional claims to sue in federal court without first exhausting judicial or administrative remedies." *Hellenic Am. Neighborhood Action Comm.,* 101 F.3d at 881 *(citing Kraebel v. New York City Dep't of Hous. Preservation & Dev.,* 959 F.2d 395, 404 (2d Cir.1992)); *see also Patsy,* 457 U.S. at 500–01, 102 S.Ct. 2557; *Monroe v. Pape,* 365 U.S. at 183, 81 S.Ct. 473, *overruled on other grounds by Monell v. Department of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). There is no constitutional violation when the state affords an adequate post-deprivation remedy for a random, arbitrary deprivation of property or liberty. *Zinermon v. Burch,* 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Hudson,* 468 U.S. at 531, 533, 104 S.Ct. 3194; *Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. Thus, plaintiff's due process claim must be dismissed.

**2d. Plaintiff's Fourth Cause of Action**

Plaintiff, in his Fourth cause of action, contends that the defendants' actions in dismissing him from the police force violated his rights under the Equal Protection Clause of the Fourteenth Amendment.

Defendants' motion for summary judgment as to this claim is denied.[12]

■■■■■ Because plaintiff bases his equal protection claim on an allegation of selective enforcement, he must show that he was subjected to selective enforcement of the law "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual. *See Huebschen v. Department of Health and Soc. Servs.,* 716 F.2d 1167, 1171 (7th Cir.1983). To state an equal protection claim for selective enforcement, plaintiff must show: (1) that he was selectively treated compared with others similarly situated, and (2) that the selective treatment was prompted by an impermissible consideration, such as membership in a suspect class, intent to inhibit or punish the exercise of a constitutional right, or malicious or bad faith intent to injure. *See Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996); *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995); *LaTrieste Restaurant & Cabaret v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994).

■■■■ Plaintiff alleges that he was selectively treated because he was subjected to a disciplinary hearing and terminated from employment while other officers on the force who had engaged in misconduct were not required to undergo a hearing or terminated for that misconduct. Plaintiff's Brief at 37–38. Plaintiff notes that at least one other police officer was disciplined after an accusation by his wife that he assaulted her, but that officer was not put through a disciplinary hearing and was suspended for two weeks rather than terminated. Plaintiff's Brief at 37. Plaintiff further alleges that *no* other disciplinary hearings pursuant to Section 75 of the New York Civil Service Law have been held against members of the Middletown Police Department since 1986, and that only one other hearing was held by the Board of Police Commissioners since approximately 1975. Plaintiff's Brief at 39.

Defendants reply that the decision of the police department to discipline its members is a purely discretionary one, and that, where deemed appropriate, disciplinary action has been taken when police officers within the department break the rules. They argue that plaintiff has merely demonstrated that individual officers are dealt with on a case-by-case basis.

■■■■ The heart of Birmingham's equal protection claim is that his constitutional rights were violated because the Rules of Conduct and the Civil Service Law were applied to *him* when they were not applied equally to *others.* However, "[t]here is no right under the Constitution to have the law go unenforced against you, even if you are the first person against whom it is enforced, and even if you think (or can prove) that you are not as culpable as some others who have gone unpunished." *Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 (6th Cir.1996). Even if plaintiff could prove his allegation that at least one other officer went undisciplined for domestic abuse, failure to proceed against others who are comparably situated is not *by itself* a basis for finding a denial of equal protection. *Zahra,* 48 F.3d at 684 (emphasis added). "Equal protection does not require that all evils of the same genus be eradicated or none at all."

---

**12.** Defendants correctly note that plaintiff's complaint is devoid of factual allegations to support a *prima facie* case of selective enforcement. However, because I address the motion to dismiss at the summary judgment stage, and have considered material beyond the pleadings, I will treat the factual allegations contained in plaintiff's responsive motion papers as though they were plead in the complaint and address the merits of plaintiff's equal protection claim.

*Zahra,* 48 F.3d at 684 (quoting *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980)).

To sustain an equal protection claim based on alleged selective enforcement, plaintiff must also show invidious discrimination. Birmingham does not claim membership in any suspect or quasi-suspect group; he does not claim denial of equal protection based on race, religion, nationality or gender. Rather, he.claims that he was singled out for discipline because of his criticizing political cronyism in the Middletown Police Department.

The Second Circuit has held that selective enforcement intended to discourage or punish the exercise of a constitutional right or based on malicious or bad faith intent to injure *may* afford a basis for relief under § 1983. *LeClair,* 627 F.2d at 610. When such a selective enforcement claim can be successfully maintained is unclear.[13] However, viewing the evidence in the light most favorable to plaintiff, it would appear that he has raised a disputed issue of fact with respect to whether defendants intended to discriminate against him based on his exercise of protected speech, or based on malicious or bad faith intent to injure him. Therefore, defendants' motion for summary judgment as to plaintiff's selective enforcement claim must be denied.

### 2e. Plaintiff's Fifth Cause of Action

▆ As his Fifth cause of action, plaintiff asks the court to assert supplemental jurisdiction over a state law claim for relief pursuant to Article 78 of the New York CPLR. Plaintiff states in his complaint that, "by reason of repeated *ex parte* communications between Ogden and the Mayor[,] the Mayor was disqualified as a matter of law from presiding over, participating in and/or voting with respect to the disciplinary hearing/charges at issue," and "... the Mayor's failure to re-

cuse himself was arbitrary, capricious, and/or otherwise unlawful in violation of Plaintiff's state law entitlements to a fair hearing." Complaint ¶¶ 36, 37. Plaintiff asserts that, pursuant to Article 78, his disciplinary hearing and conviction "must be declared null and void." Complaint ¶ 38.

Plaintiff asks this court to function as a state tribunal and conduct an Article 78 hearing. The courts that have addressed such a request have noted that Article 78 is "a novel and special creation of state law" and "a purely state procedural remedy." *See, e.g., Camacho v. Brandon,* 56 F.Supp.2d 370, 379–80 (S.D.N.Y. 1999) (*citations omitted* ); *Lucchese v. Carboni,* 22 F.Supp.2d 256, 258 (S.D.N.Y.1998). Article 78 provides a special proceeding for judicial review of action by "every court, tribunal, board, corporation, officer, or other person, or aggregation of persons . . . ." N.Y.C.P.L.R. § 7802(a). "[I]t cannot be said that an Article 78 proceeding . . . is a suit of a civil nature at common law or in equity." *Herrmann v. Brooklyn Law School,* · 432 F.Supp. 236, 240 (E.D.N.Y. 1976). Rather, Article 78 actions were "designed for the state courts, and are best suited to adjudication there." *Lucchese* at 258 (*citing Herrmann* at 240).

Counsel for plaintiff, having served as · counsel in both the *Camacho* and *Lucchese* cases, is well aware that the federal courts are loath to exercise jurisdiction over Article 78 claims. Even where a plaintiff has one or more federal claims still alive—as did plaintiffs Camacho and Lucchese, and as does Birmingham—the interests of judicial economy are not served by embroiling this court in a dispute over local laws and state procedural requirements. Article 78 "is designed to facilitate a 'summary disposition' of the issues presented, [and] . . . is

---

**13.** As one circuit court has commented, both the First and Second Circuits have stated that they will allow relief on such grounds, but "neither court, despite the citation of general language indicating the possibility of a successful action, has ever affirmed a victory for

the plaintiff on such a theory." *Futernick v. Sumpter Township,* 78 F.3d 1051, 1057 (6th Cir.1996) (citations omitted). The *Futernick* court therefore thought it "unwise to adopt the often-stated, but never-used, rule" of those two circuits. *Id.* at 1058.

'a fast and cheap way to implement a right.'" *Lucchese* at 256 (*quoting Davidson v. Capuano*, 792 F.2d 275, 280 (2d Cir.1986)). I decline to exercise supplemental jurisdiction over plaintiff's Article 78 claim, and remit him to state court to seek review of his termination through the special vehicle the state has provided for such review.[14]

### 3. *Monell* liability

Plaintiff has asserted claims against the City of Middletown. It is axiomatic that no such claim will lie in the absence of evidence that plaintiff's constitutional rights were violated pursuant to a policy or practice of the municipality. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In spite of the well known requirements for stating a claim under *Monell*, nowhere in plaintiff's complaint does he use the words "policy" or "practice," and nowhere does he describe the actions of the City of Middletown (via its Board of Police Commissioners) in terms sufficient to maintain a cause of action against that defendant. Plaintiff's claims against the City should be dismissed for this reason alone.

 However, plaintiffs have briefed the *Monell* issue in response to defendants' motion for summary judgment, and I can dispose of the claims against the City based on the merits of the parties' submissions. Therefore, I do so on that ground.

Defendants urge that the City of Middletown may not be held liable for the Board of Police Commissioners dismissal of plaintiff because, even if plaintiff were able to prove that the actions of the defendants in connection with his dismissal were unconstitutional, the evidence does not demonstrate that the decision was made pursuant to an existing municipal policy, or that the basis for the decision was adopted as official custom or policy by the City. Defendants incorrectly assert that a single act is never sufficient to establish liability on the part of a municipality under *Monell*, but they are correct that the single act at issue in *this* case does not reflect or establish any municipal policy.

Here, the only fair inference is that what happened to plaintiff (assuming things occurred as he claims) was unique to him—a deeply personal vendetta carried out by persons who were out to get him. That is not municipal action taken pursuant to policy or practice—unless plaintiff were to present this court with evidence that Chief Ogden and Mayor DeStefano and their cronies make it a practice to cook up disciplinary charges against outspoken police officers in order to procure their dismissal. There is no such evidence in the record before this court.

Plaintiff, relying on the indisputable fact that the Mayor and Police Chief qualify as "policy makers," asks this Court to rule, in effect, that every personnel decision made or action taken by a policy maker rises to the level of municipal policy. As counsel for plaintiff puts it, "the requirement of establishing policy is met when federal law is violated by an act of a policymaker." Plaintiff's Brief at 44. This Court has been confronted with the same argument (always propounded by the same law firm) in literally dozens of civil rights cases. I have always dismissed it. I dismiss it here.

 It has been clear since the Supreme Court's decision in *Pembaur v. City of Cincinnati* that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." 475 U.S. 469, 479, 106 S.Ct.

---

**14.** Plaintiff's Article 78 proceeding is not yet time barred. Although an Article 78 proceeding must be commenced "within four months after the determination to be reviewed becomes final and binding ...," N.Y.C.P.L.R. § 217, plaintiff filed his federal court action on October 30, 1997, which was within four months from the date he was notified of the Department's termination decision, in mid-July 1997. The statute of limitations has been tolled during the pendency of this action, and continues to be tolled for a period of 30 days from the date of this Order. 28 U.S.C. § 1367.

**374**

1292, 89 L.Ed.2d 452 (1986). However, "[t]he fact that a particular official—*even a policymaking official* —has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292 (emphasis added). In this case, while the Board of Police Commissioners had the discretion to determine whether officers brought before it should be disciplined or dismissed, its decision to dismiss based on the facts of Birmingham's individual case—even if incorrect, and, in fact, even if unconstitutional—would not necessarily constitute municipal policy on personnel or disciplinary matters. Under *Pembaur*, the decisionmaker must be responsible for establishing *final government policy* respecting the particular activity before the municipality can be liable. *Id.* (*citing Oklahoma City v. Tuttle*, 471 U.S. 808, 822–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

 Whether an official has final *policymaking* authority is a question of state law. *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292. Neither party to this action has addressed this issue or presented the court with law or evidence regarding the policymaking authority—or lack thereof—of the Board of Police Commissioners with respect to final personnel actions. Defendants assert that the Board did not act pursuant to a policy or practice. Plaintiff simply asserts that, because the Mayor is a policymaker, the Board was acting pursuant to policy. Absent some evidence of state law that vests final authority in the Board of Police Commissioners to establish personnel *policy* for the City of Middletown (or absent evidence that it was the practice of the City to terminate police officers who engaged in disfavored speech on public matters), plaintiff has failed to raise a disputed issue of fact as to whether the defendant City dismissed him pursuant to an unconstitutional policy or practice. Defendants' motion for summary judgment

on plaintiff's claims against the City must, therefore, be granted.

### 4. Qualified Immunity

 Defendant Ogden, who has been sued in his individual capacity, contends that he is entitled to qualified immunity from liability on plaintiff's remaining claims, for First Amendment retaliation and for selective prosecution under the Equal Protection Clause. Ogden's request for qualified immunity is denied.

 In general, public officials are entitled to qualified immunity if their conduct does not violate constitutional rights that were clearly established at the time the alleged violation occurred. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir.1996); *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991). Even when a plaintiff's federal rights are so clearly defined that a reasonable public official would know that his actions violate those rights, qualified immunity may still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights. *Kaminsky*, 929 F.2d at 925; *see also Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Weyant*, 101 F.3d at 857.

It is well settled, and was so at the time the actions of the defendants took place, that a public employee may not be discharged for the exercise of First Amendment rights. Therefore, Chief Ogden cannot claim that he did not know it would be unlawful for him to prefer disciplinary charges against Lieutenant Birmingham simply because Birmingham voiced opinions that the Chief disagreed with regarding administration of the Middletown Police Department. Chief Ogden does not, of course, claim that. Rather, Ogden asserts that it was objectively reasonable for him to believe that his act of preferring disciplinary charges against plaintiff was taken in accordance with the law, because the

Chief had discretion to determine whether plaintiff ought to be charged with violating the Department's Rules of Conduct and whether a disciplinary hearing ought to be recommended. Ogden argues that, even if his acts are found to be unconstitutional, a rational jury could find that reasonable officials could disagree about the legality of preferring charges against plaintiff based on the circumstances.

■ Use of the "objective reasonableness" test enables courts to decide qualified immunity claims as a matter of law when there are no material issues of disputed fact. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995); *see also DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.,* 952 F.2d 661, 666 (2d Cir.1992). In other words, in a case such as this, where the law is clearly settled, summary judgment may be granted on qualified immunity grounds if "the *only* conclusion a rational jury could reach is that reasonable [officials] would disagree about the legality of the defendants conduct under the circumstances." *Lennon,* 66 F.3d at 420 (emphasis added).

As with any motion for summary judgment, when deciding a motion for qualified immunity, the court must view the record most favorably to the party opposing the motion. Plaintiff alleges that the criminal assault complaint should never have issued—a position that can fairly be said to be supported by the testimony of plaintiff's wife at the disciplinary hearing, to the effect that: she did not know if plaintiff struck her, "the police officers kept saying they needed to know and I kept saying I didn't know," and she went to the police department because "Lou Ogden requested strongly that I come in and talk to him. It was at his urging." *See* Transcript of May 30, 1997 Board of Police Commissioners Hearing, attached as Ex. 13 to the Affidavit of Kim Berg, at 24–25, 29, 32, 52. Furthermore, plaintiff asserts that Chief Ogden *knew* that the assault charge was false, or at least suspect (because he in fact helped to procure it from the confused and heavily medicated Virginia), and that the criminal complaint was, therefore, not a valid basis on which to bring departmental disciplinary charges against plaintiff.

I find that a rational jury *could* come to the conclusion that Chief Ogden did not act reasonably under the circumstances. Therefore, the court cannot make a qualified immunity determination at this time. Defendant's motion is denied.

This constitutes the decision and order of the court.