Gregory J. NONNENMANN, Plaintiff,

v.

THE CITY OF NEW YORK, Rudolf Giuliani, Mayor of the City of New York, Howard Safir, Police Commissioner of the City of New York, Chief Michael Markman, NYC Police Department and John Does, Defendants.

No. 00 CIV. 4139(MBM).

United States District Court, S.D. New York.

Nov. 26, 2001.

Gregory J. Nonnenmann, Esq., Mt. Sinai, NY, Petitioner Pro Se.

Michael D. Hess, Esq., Corporation Counsel of the City of New York, Jeffrey S. Dantowitz, Esq., Assistant Corporation Counsel, New York City.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Gregory J. Nonnenmann sues defendants the City of New York, the New York Police Department ("NYPD"), and several named and unnamed municipal officials,[1] alleging unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, the First and Fourteenth Amendments, and the Equal Pay Act. Defendants move to dismiss all claims. In accordance with an earlier order of this court, *Nonnenmann v. City of New York,* No. 00 Civ. 4139 (S.D.N.Y. Mar. 22, 2001), this motion will be considered as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the

---

1. One name is misspelled. Mayor Rudolph W. Giuliani is sued as "Rudolf" Giuliani.

reasons set forth below, defendants' motion is granted as to all claims.

## I.

The following facts are either undisputed or presented in the light most favorable to plaintiff. In October of 1991, plaintiff Gregory J. Nonnenmann, a white, male officer in the NYPD and a practicing attorney, offered support to Elisa Breland, a female, African–American officer who had complained of race and gender discrimination in the NYPD. (Compl.¶ 7) With the help of Nonnenmann's testimony, Officer Breland filed claims with both the NYPD's Office of Equal Employment Opportunity ("OEEO") and, in May of 1992, with the federal Equal Employment Opportunity Commission ("EEOC"). (Dantowitz Decl. of 9/21/00 Ex. A ¶¶ 35, 41) On May 13, 1993, she filed suit in federal court against the City of New York, the NYPD, and several other named defendants. (Compl.¶ 10) The case was settled in May 1995 for $145,000. (*Id.*)

Displeased with Nonnenmann's efforts to assist Officer Breland, the NYPD began in 1991 to engage in unlawful retaliatory actions. (Compl.¶ 8) In a complaint filed on January 6, 1993 in New York Supreme Court, King's County, Nonnenmann alleged that the City of New York, the NYPD, and others had defamed his reputation and violated numerous provisions of the New York Civil Rights Law and Executive Law. (Dantowitz Decl. of 9/21/00 Ex. A) Among the incidents about which Nonnenmann complained were the following: 1) slanderous statements about his arrest patterns (*id.* ¶ 8); 2) low job-performance ratings because of false and defamatory allegations and denial of his appeal of those ratings (*id.* ¶¶ 15, 18, 46); 3) pretextual disciplinary charges for failure to supervise, investigate, and keep proper records, as well as for the unauthorized use of

a department vehicle (*id.* ¶¶ 20, 22–35, 38); 4) denial of his grievances and requests for a career path transfer (*id.* ¶¶ 44–45, 47); and 5) improper release of information from his personnel file (*id.* ¶ 59). In May of 1999, Nonnenmann and the named defendants settled the case for $90,0000. (Compl.¶ 9) The settlement terms were embodied in a "Stipulation of Settlement and Discontinuance" executed on April 26, 1999 (Dantowitz Decl. of 9/21/00 Ex. B) and a "General Release" that Nonnenmann signed on May 4, 1999 (*id.* Ex. C).

Nonnenmann's state court complaint encompassed only incidents up to January 6, 1993. (Dantowitz Decl. of 9/21/00 Ex. A) Although Nonnenmann moved in October 1998 to amend his complaint to include incidents that occurred after 1993, the court denied the motion. (Defs.' Reply Mem. of Law at 4) In his complaint in this court, Nonnenmann requests monetary relief for similar retaliatory measures undertaken between January 6, 1993 and May 2, 2000, allegedly in violation of Title VII, the First and Fourteenth Amendments, and the Equal Pay Act. (Compl.¶ 1)

The specific incidents that Nonnenmann describes in the present action are distinct from those in his state court complaint, but they are similar in nature: 1) in 1993 and 1994, he was denied requests to meet with the mayor and police commissioner "to discuss retaliation and discrimination in the workplace" (*id.* ¶ 18); 2) on August 26, 1993, he was disciplined for failing to respond to a 10–13 officer-in-need-of-assistance call (*id.* ¶ 19); 3) on May 5, 1994, he was docked five days pay for unauthorized use of a police vehicle (*id.* ¶ 20); 4) on June 24, 1994, he was disciplined for spending his tour of duty at the office of the Corporation Counsel conducting personal business—attending depositions that were purposely scheduled to inconvenience him (*id* . ¶¶ 21–22); 5) from 1992 to 1996,

all of his requests to transfer out of the 75th Precinct were denied (*id.* ¶ 28); 6) on September 26, 1997, he was disciplined for being 50 minutes late for work (*id.* ¶ 23); 7) on January 13, 1998, he was improperly questioned about his lawsuit during a meeting of the promotional review board (*id.* ¶ 24); 8) from January 13, 1998 to July 1998, he was turned down twice for the position of lieutenant (*id.* ¶ 25); 9) from August 20, 1998 to the present, he has been denied a transfer from the 28th Precinct to a more convenient one in Queens (*id.* ¶ 27); and 10) on March 8, 2000, he was given late notice that his appeal of a disciplinary action was rejected, and the delay prevented him from filing a timely grievance under the collective bargaining agreement (*id.* ¶ 29).

Defendants have moved to dismiss all of Nonnenmann's claims. First, they argue that Nonnenmann's claims that arose prior to May 4, 1999 are barred by the state court release he executed on that date. (Defs.' Mem. of Law at 5–6) Alternatively, they argue that plaintiff's Title VII claims occurring prior to March 25, 1999 are time-barred because of plaintiff's failure to file an EEOC charge within 300 days of the relevant incidents. (*Id.* at 7 n. 2) If either assertion is correct, then none of plaintiff's Title VII allegations can be considered except for: 1) any denials of Nonnenmann's transfer requests that occurred after the spring of 1999; and 2) the NYPD's untimely March 8 2000 notice to Nonnenmann that his appeal had been denied. (*Id.* at 6)

As for these two remaining incidents, defendants maintain that they do not make out a prima facie case of retaliation under Title VII. (*Id.* at 7–11) Defendants also argue that Nonnenmann has no First Amendment claim because he has not spoken on "a matter of public welfare" (*id.* at 11–13), nor any Fourteenth Amendment

equal protection claim because he is not a member of any protected class (*id.* at 13–14), nor any Equal Pay Act claim because there is no allegation that he has been underpaid relative to female workers (*id.* at 15–16). To the extent that any of plaintiff's claims remain, defendants maintain that the NYPD is not a proper defendant. (*Id.* at 16)

## II.

First, I examine Nonnenmann's Title VII retaliation claims. Before I evaluate whether he has made a prima facie case, I must determine which incidents I may consider, and which are barred from consideration either by the settlement agreement or by the nature and timing of plaintiff's EEOC filings. For the reasons explained below, I conclude that plaintiff's Title VII claims arising prior to the spring of 1999 are barred either by the settlement agreement or by plaintiff's EEOC filings. I further conclude that the claims that remain fail to make out a prima facie case.

### A. *Which Incidents Can Be Considered?*

 1. *The Settlement Agreement.*— The relevant language of the April 26, 1999 "Stipulation of Settlement and Discontinuance" that terminated Nonnenmann's 1993 state court complaint reads as follows:

> Plaintiff Gregory J. Nonnenmann agrees to a dismissal of all the claims . . . from any and all liability, claims, or rights of action which the Plaintiff now has, may heretofore have had, or hereafter may have, in any manner, arising out of or related to the transaction and occurrences alleged in the Complaint, or that could have been alleged in the Complaint in connection with those transactions and occurrences, including claims for costs, expenses and attorney fees.

(Dantowitz Decl. of 9/21/00 Ex. B) Non-nenmann's "General Release," executed on May 4, 1999, uses similar language:

> I, Gregory J. Nonnenmann ... do hereby release and discharge the Defendants ... from any and all claims which were or could have been alleged by me in the [state court] action arising out of the events alleged in the Complaint in said action, including all claims for attorney's fees and costs.

(*Id.* Ex. C).[2]

Based upon this language, defendants initially argued that all incidents before May 4, 1999 should be barred from consideration because they "could have been alleged" in the state court complaint, but were not. (Dantowitz Decl. of 9/21/00 ¶¶ 3–4; Defs.' Mem. of Law at 5–6) Nonnenmann, however, points out that the claims he has brought in this action could not have been alleged in his original state court complaint because his motion to amend the complaint was denied in 1998. (Pl.'s Mem. of Law at 2–3) In their reply, defendants do not directly challenge this contention; rather, they point to other text in the settlement agreement barring claims "arising out of or related to the transactions or occurrences alleged in the [state court] Complaint" and argue that it unambiguously precludes Nonnenmann's post-May 4, 1999 claims. (Defs.' Reply Mem. of Law at 3) This unambiguous text, defendants further argue, bars consideration of any extrinsic evidence as to what the agreement means. (*Id.* at 3–5)

▪ Under New York law, the meaning of a release is to be determined in accordance with general principles of contract law. *Albany Savings Bank, FSB v. Halpin,* 117 F.3d 669, 672 (2d Cir.1997)

(citing *Mangini v. McClurg,* 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 512, 249 N.E.2d 386 (1969)). "Parol evidence is admissible to aid in interpretation of a contract only when the language of the contract is ambiguous." *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525 (2d Cir.1990) (citing *Namad v. Salomon Inc.,* 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 80–81, 543 N.E.2d 722 (1989)). "[W]hether a contract is ambiguous is a matter of law for the court to decide, and parol evidence is not admissible to create an ambiguity." *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996) (citing *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162–63, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990)). "Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Burger King,* 893 F.2d at 527 (citing *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231 (1986)).

Applying these principles to the contract in this case, I believe that the language of the settlement agreement is ambiguous. I cannot determine from the words of the agreement itself whether the preclusion of claims "arising out of or related to the transaction and occurrences alleged in the Complaint" refers broadly to all claims of retaliation associated with Officer Breland's case, or more narrowly only to the specific instances of retaliation alleged in the 1993 complaint. Because the settlement agreement is ambiguous, I may consider the extrinsic evidence that the parties have presented. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992).

---

2. Because the "Stipulation of Settlement" and "General Release" express virtually identical sentiments as part of a single, common understanding, I consider the language of both agreements to be authoritative.

Unfortunately, the extrinsic evidence in this case is unavailing. The central piece of evidence is a draft version of the settlement agreement and release that contains handwritten suggestions from Nonnenmann as to how the agreement should be modified. (Nonnenmann Decl. Ex. D) The suggestions clearly illustrate that he hoped to limit the scope of the settlement to claims that arose prior to the date of the state court complaint—January 6, 1993. However, defendants rejected Nonnenmann's language and, instead, the parties agreed to the compromise language excerpted above, which does not specify exactly what is to become of plaintiff's claims arising between 1993 and 1998.

█ As I cannot without further evidence make a determination regarding the scope of the "transactions and occurrences" that the parties intended to preclude from further litigation, I would ordinarily deny summary judgment on this issue and allow it to proceed to trial, assuming plaintiff otherwise makes out a prima facie case. *See Burger King*, 893 F.2d at 528 ("Summary judgment normally is inappropriate when a contractual term is ambiguous because a triable issue of fact exists as to its interpretation."). However, that is not the correct course in this case because in order to find that Nonnenmann's present claims are not barred by the settlement agreement, I must find that they are unrelated to, and do not arise out of, the claims alleged in plaintiff's state court complaint. But if I find that to be true then, for the reasons explained below, plaintiff's EEOC filing is untimely as a matter of law for all Title VII claims prior to the March 25, 1999, and those claims cannot go forward. Thus, under any possible interpretation of the settlement agreement, the claims are barred and a trial as to the agreement's meaning is unnecessary.

*2. Nonnenmann's EEOC Filings.*—In order to sue under Title VII, a party in New York must first file a complaint with the EEOC within 300 days of the alleged unlawful act. *See* 42 U.S.C. § 2000e–5(e)(1) (1994); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998). Defendants argue that because Nonnenmann did not file a complaint with the EEOC until January 14, 2000, all claims that occurred prior to March 25, 1999 (300 days prior to the filing) are now precluded. (Defs.' Mem. of Law at 7 n. 2; Defs.' Rep. Mem of Law at 5 n. 2) Plaintiff offers three different reasons why this result does not follow: 1) his original EEOC filing in May 1992, preceding his state court suit, was sufficient to cover all subsequent acts of retaliation (Pl.'s Mem. of Law at 6); 2) his January, 2000 EEOC complaint alleged a single, continuing violation that began at least as early as 1993 and that persisted up to the date of that filing (*id.*); and 3) the doctrines of waiver, estoppel, and equitable tolling relieve him of the filing requirement (*id.*).

However, the first two of these theories require proof that the present complaint is related to and is a continuing form of the retaliation alleged in his state court complaint brought in 1993. If either theory were established, the settlement agreement would bar his claims. Nonnenmann cannot have it both ways: either his present claims are closely related to his 1993 claims, in which case they are timely brought but barred as related claims by the settlement agreement, or they are separate, in which case they are not barred by the settlement agreement but they are untimely.

█ Nonnenmann's first theory—that his 1992 EEOC filing is sufficient to permit him to sue for all subsequent acts of retaliation—requires a finding, fatal for the purposes of the settlement agreement,

that the subsequent acts of retaliation he complains about are "reasonably related" to the original filing. Under this theory, a court may consider Title VII claims that "are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993). Plaintiff's current claims likely would meet the "reasonably related" standard. In describing the types of claims that are generally considered to be "reasonably related" to a previous EEOC filing, the Second Circuit has listed claims "alleging retaliation by an employer against an employee for filing an EEOC charge," *id.* at 1402, and claims "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge," *id.* Plaintiff's problem, however, is that if his claims are "reasonably related" to his 1992 EEOC filing, then they must also be "related to" the "transaction and occurrences" alleged in his 1993 state court action based on the same filing (Dantowitz Decl. of 9/21/00 Ex. B). And if that is true, his claims are barred under the 1999 settlement agreement.

■ Plaintiff's second theory as to why his claims are timely encounters a similar problem. Under the "continuing violation" exception to the 300–day Title VII limitations period, if a plaintiff brings a claim that is timely as to one incident of an ongoing pattern of discrimination, the claim is valid as to all incidents of discrimination that are a part of that pattern. *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993). "Continuing violation" assertions, however, are difficult to maintain because the doctrine is "disfavored" in the Second Circuit. *See Oshinsky v. New York City Hous. Auth.*, No. 98 Civ. 5467, 2000 WL 218395, at *8

(S.D.N.Y. Feb.23, 2000); *Lloyd v. WABC–TV*, 879 F.Supp. 394, 399 (S.D.N.Y.1995). Accordingly, a plaintiff asserting a "continuing violation" must demonstrate "specific ongoing discriminatory policies or practices, or ... specific and related instances of discrimination ... permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn*, 159 F.3d at 766. "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism" will not suffice. *Id.* (internal quotation marks omitted).

Although it is conceivable that Nonnenmann could prove a continuing violation under this difficult standard, I do not believe, given the criteria laid out above, that plaintiff could successfully demonstrate a continuing violation without simultaneously proving that the incidents that led to his 2000 complaint are "related to the transaction and occurrences" covered by the settlement in the state court action. If Nonnenmann can prove, as required, that the NYPD is engaged in a specific ongoing policy or practice of discrimination, his papers make it clear that this policy or practice predates his 1993 complaint. In his present complaint, Nonnenmann explains that the NYPD began retaliating against him in October 1991, when he first began to assist Officer Breland. (Compl.¶¶ 7–8) In his 1993 complaint, he specifically described a January 1992 threat of retaliation in which an NYPD lieutenant stated that "sergeants should back lieutenants in squashing EEOC and OEEO complaints" and that "anybody who didn't would be his enemy [and] that he had fought in Vietnam and knew how to kill his enemies." (Dantowitz Decl. of 9/21/00 Ex. A at 13) His 1993 complaint also recites allegations of retaliatory defamation as well as unfounded disciplinary charges that occurred prior to 1993. (*Id.*

at 2–13) It is clear that any "continuing violation" that Nonnenmann could prove is one that began sometime prior to 1993 and has continued until the present. It is impossible for Nonnenmann to prove that there was a continuing violation occurring from 1993 to the present, but that the events that occurred after 1993 are neither "related to" nor "arising out of" the events that occurred prior to 1993.

 Finally, there is no basis for Nonnenman's third argument that waiver, estoppel, or equitable tolling of the EEOC filing requirements is warranted in this case. Waiver is absent because defendants have preserved their limitations defense by moving to dismiss on that ground, *see Pell v. Trustees of Columbia Univ.*, No. 97 Civ. 0193, 1998 WL 19989, at *7 (S.D.N.Y. Jan 21, 1998), and plaintiff suggests no other ground for waiver. Estoppel is also unavailable. The doctrine applies when a plaintiff knows he has a cause of action, but fails to make a timely filing because he relies on defendant's fraudulent misrepresentations. *See Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 60–61 (2d Cir.1986). There is no basis for estoppel in this case because Nonnenmann does not allege, nor is there any evidence, that defendants have made any such misrepresentations. Last, equitable tolling is inappropriate because "[t]he essence of the doctrine is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Dillman,* 784 F.2d at 60 (internal quotation marks omitted); *see Bennett v. U.S. Lines, Inc.*, 64 F.3d 62, 66 (2d Cir.1995). In this case, Nonnenmann is an attorney who was already involved in related litigation when

the claims at issue arose. He was certainly aware that he had a cause of action and it was his prerogative to decide how best to preserve it.

In light of all the above, I conclude that I cannot consider any of Nonnenmann's allegations that arose prior to the spring of 1999. It is unnecessary to specify whether this conclusion arises because the settlement agreement precludes his related claims, or because his pleading of unrelated claims is untimely under Title VII. In evaluating plaintiff's Title VII claims, the result is the same under either scenario— all incidents occurring prior to the spring of 1999 are barred from consideration.[3]

B. *The Prima Facie Case*

 In order to make out a prima facie case of discriminatory retaliation under § 704(a) of Title VII, 42 U.S.C. § 2000e–3(a) (1994), a plaintiff must demonstrate the following:

(1) [plaintiff] was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.

*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993)). Because I conclude that neither the NYPD's post-spring 1999 denials of Nonnenmann's transfer requests nor the NYPD's untimely March 8, 2000 notice to Nonnenmann that his appeal had been denied constituted an "adverse

---

**3.** If the allegations are untimely under Title VII, then claims prior to March 25, 1999 (300 days before Nonnenmann's EEOC filing) are precluded. If the claims are precluded by the settlement, then the relevant cut-off date is

May 4, 1999 (the day Nonnenmann signed the release). Given the resolution of plaintiff's Title VII claims below, the difference is immaterial.

employment action," defendants' motion for summary judgment is granted as to these two remaining Title VII claims.

 Plaintiff's complaint alleges that from August 20, 1998 until the present, he made "formal requests to be transferred" from the 28th Precinct in Harlem, which is approximately 120 miles round-trip from his residence in Suffolk County, to a more convenient precinct in Queens.[4] (Compl. ¶ 27; Nonnenmann Decl. ¶ 44). A transfer to the 111th Precinct in Bayside, Queens (the precinct closest to his home), for example, would result in a round-trip commute of approximately 93 miles.[5] Nonnenmann states that during this time period, "several thousand lieutenants have been transferred ... several hundred being in the county of Queens," and that he had seniority over at least some of these transferees. (Nonnenmann Decl. ¶ 44) He believes that the NYPD's failure to transfer him has been motivated by retaliatory animus. (Id.)

Under certain circumstances, a failure to transfer could constitute an adverse employment action. For example, in *Belch v. Jefferson County*, 108 F.Supp.2d 143 (N.D.N.Y.2000), the court held that a failure to transfer was an adverse employment action when "the change in position would have resulted in a significant change in duties and could potentially lead to increased opportunities for advancement." *Id.* at 154. Similarly, in *Meckenberg v. New York City Off–Track Betting*, 42

F.Supp.2d 359 (S.D.N.Y.1999), the denial of a request for a transfer to a department with a lighter work load and more opportunities for advancement was considered to be an adverse employment action. *Id.* at 378.

However, unlike the failure-to-transfer claims at issue in the above cases, Nonnenmann's did not involve a material change in working conditions. Plaintiff has made no allegation that the salaries, benefits, or opportunities for advancement in the two jobs are any different; he asserts only that the transfer he seeks would allow him to work closer to his home. Many courts in this Circuit have held this type of change to be insufficient as a matter of law to constitute an adverse employment action. *See, e.g., Galabya v. New York City Bd. of Educ.*, 202 F.3d 636 (2d Cir.2000) ("To be 'materially adverse' a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."); *Gronne v. Apple Bank for Sav.*, No. 98–CV–6091, 2000 WL 298914 (E.D.N.Y. Feb.14, 2000) ("To be actionable ... [plaintiff's] transfer to the Lindenhurst branch must constitute 'a materially adverse change in the terms and conditions of employment.' " (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997))); *id.* ("A purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance cannot rise to the level of a materially adverse employment ac-

---

4. Nonnenmann asserts that the 28th Precinct is a 130–mile round-trip commute from his home. (Compl.¶ 27) However, a federal court may take judicial notice of geographic distances. *See, e.g., Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir.1997); *Metrokotsas v. U.S. Fleet Leasing, Inc.*, No. 90 Civ. 0656, 1991 WL 169394, at *2 (S.D.N.Y. Aug. 28, 1991). I note that, according to the internet site *www.mapquest.com*, the round-trip driving distance from the plaintiff's address in Mount Sinai, New York to the 28th Precinct in Harlem is

120.4 miles. I use this distance for purposes of comparison.

5. The round-trip driving distance is exactly 93.4 miles, according to *www.mapquest.com*. In contrast, the round-trip driving distance to the farthest Queens precinct from Nonnenmann's home—the 100th Precinct on the Rockaway Peninsula—is 124.8 miles, which is greater than the distance to the Harlem precinct to which he was assigned.

tion." (quoting *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996))); *Mishk v. Destefano,* 5 F.Supp.2d 194, 202 (S.D.N.Y.1998) ("Plaintiff's ... transfer from [one] Unit to [another] Unit does not satisfy the adverse employment action standard in the absence of any allegation or evidence that the new position was somehow inferior to plaintiff's previous position.").

Although some contrary authority exists in cases dealing with an involuntary transfer to an identical job in an inconvenient location, *see, e.g., Medwid v. Baker,* 752 F.Supp. 125, 138–39 (S.D.N.Y.1990) (holding that whether an involuntary transfer from New York to Los Angeles was adverse was a question of fact), I have found no case in which denial of a request for a purely lateral transfer was found to constitute an adverse employment action. In fact, in a scenario very similar to Nonnenmann's, the court in *Duncan v. Shalala,* No. 97 CV 3607, 2000 WL 1772655 (E.D.N.Y. Nov.29, 2000), found that "denial of a hardship transfer request" so that an employee could live near his wife was not "an adverse employment action as defined by Title VII." *Id.* at *4. The Court reasoned that although "the difference in location is certainly of tantamount importance to Plaintiff, it does not raise the denial of Plaintiff's transfer request to the level of an adverse employment action." *Id.*

■ "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). In this case, I conclude that the denial of a lateral transfer request from one police precinct to another precinct located, at most, 13.5 miles closer to home is insufficient to constitute an adverse employment action. Either way, Nonnenmann's commute would be substantial—the difference between the 120 miles round-trip he must commute to Harlem and the 93 miles he would have to commute to Bayside, Queens (in plaintiff's best-case scenario) is not enough to make the transfer denial adverse.[6] "The realities of the workplace dictate that employees do not always have the option to work in the location they desire." *Little v. New York,* 96 Civ. 5132, 1998 WL 306545, at *5 (E.D.N.Y. June 8, 1998). "[N]ot every unpleasant matter short of [discharge or demotion] creates a cause of action for retaliatory discharge." *Wanamaker,* 108 F.3d at 466 (internal quotation marks omitted).

■ I also find that Nonnenmann's second remaining claim, which asserts that the NYPD gave him late notice of rejection of an appeal and thereby blocked his opportunity to file a grievance, does not constitute an adverse employment action. Nonnenmann laments that the NYPD's letter of March 8, 2000 denying his appeal came more than two years after the contested September 28, 1997 incident, in which he was docked four hours[7] from his

---

**6.** I am mindful that the extra 27 round-trip miles from Queens to Manhattan may be more difficult to traverse than the remainder of plaintiff's commute because of heavier traffic patterns and the necessity of using a bridge or tunnel to travel to and from Manhattan. Even taking this additional inconvenience into account, however, and bearing in mind that even if Nonnenmann had been transferred to Queens there is no assurance he could have been assigned to the precinct nearest his home, *see supra* p. 132 n. 5, the difference in location does not give rise to an adverse employment action.

**7.** Nonnenmann's declaration states that he was docked four hours (Nonnenmann Decl. ¶ 44), whereas Exhibit D of the complaint indicates that he was docked only three hours

time bank for being 50 minutes late to a bicycle tour assignment. (Compl. ¶ 29, Ex. D; Nonnenmann Decl. ¶ 44) The fact that he was notified of this rejection more than 90 days after it occurred, he argues, prevented him from filing a grievance under the Sergeants' Benevolent Association ("SBA") collective bargaining agreement and ultimately cost him hours from his time bank. (Compl. ¶ 29, Ex. D; Nonnenmann Decl. ¶ 44)

The only adverse consequence that Nonnenmann can point to as a result of the NYPD's untimeliness is the loss of his right to file a grievance contesting the charge, and it is unclear that he ever had this right in the first place. As defendants point out, the SBA collective bargaining agreement specifically states in its "definitions" section that "the term 'grievance' shall not include disciplinary matters." (Dantowitz Decl. of 10/30/00 ¶ 10, Ex. B at 21) The plain meaning of this text seems to bar covered officers from bringing grievances related to disciplinary matters. At the very least, this language indicates that plaintiff had some recourse outside the conventional grievance procedure.

It is not uncommon for a collective bargaining agreement to exclude disciplinary proceedings from a negotiated grievance procedure, and the purpose of such provisions is often to permit article 78 litigation in state court. *See, e.g., Dombroski v. Bloom,* 170 A.D.2d 805, 806–07, 565 N.Y.S.2d 907, 908 (3d Dep't 1991); *City of Troy v. Troy Police Benevolent and Pro-*

*tective Ass'n,* 78 A.D.2d 925, 925–26, 433 N.Y.S.2d 632, 634 (3d Dep't 1980). In the absence of a collective bargaining agreement to the contrary, "[an] employee's proper remedy for [a] claimed lack of receipt of notice [is] through the statutory appellate process," namely, "the express provisions of [New York State] Civil Service Law §§ 75 and 76[, which] limit the appealability of a final [municipal or state] agency determination to an article 78 proceeding or an appeal to the Civil Service Commission." *City of New York v. MacDonald,* 239 A.D.2d 274, 274–75, 657 N.Y.S.2d 681, 681 (1st Dep't 1997). Whatever the precise meaning of the SBA collective bargaining agreement in this case, it seems clear that the language of the agreement permits article 78 review. If plaintiff felt he was wronged, he could have filed an article 78 proceeding in state court to protect his rights. Because he has chosen not to pursue this course of action, plaintiff cannot now argue that the untimely denial of his appeal was an "adverse employment action" responsible for his loss of four hours from his time bank.[8]

### III.

■ In addition to his Title VII claims, Nonnenmann asserts that the retaliatory action that the NYPD took against him for his testimony in Officer Breland's case violated his First Amendment rights. In order to demonstrate a First Amendment violation, a government employee must show that: "(1) his speech was constitutionally protected, (2) he suffered an ad-

---

(Compl.Ex. D). The discrepancy is immaterial for the purposes of this disposition.

**8.** As a final matter, the two post-spring 1999 incidents discussed above do not give rise to a hostile work environment claim. (Pl.'s Mem. of Law at 7) If all of Nonnenmann's pre–1999 claims had survived, the question whether he encountered an abusive environment might well have been a question of fact. On the

basis of the post-spring 1999 incidents alone, however, Nonnenmann cannot as a matter of law make out a hostile environment claim that remotely resembles the hostile environment claims in the cases he cites. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990).

verse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Once this showing is made, "the interests of the [employee], as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 109–10 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). In this case, because Nonnenmann's speech was insufficiently public to constitute protected activity, no balancing is necessary and defendants' motion for summary judgment is granted as to all First Amendment claims.

 Nonnenmann asserts that his testimony on behalf of Officer Breland, in which he "[brought] attention to authorities that a superior officer ha[d] racial and gender prejudices which he expresse[d] to subordinates" constitutes protected speech. (Nonnenmann Decl. ¶ 39) To be protected from retaliation, an employee's speech must touch upon a matter of public concern, rather than one of only personal or private interest. *See Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Nonnenmann argues that race and gender discrimination by supervising officers in the NYPD is a matter of great public concern because supervisors train other police officers who, in turn, are responsible for enforcing the public laws. (Nonnenmann Decl. ¶ 41) In support of this proposition, plaintiff offers newspaper articles illustrating the public attention focused on recent, high-profile race and gender discrimination cases in the NYPD. (*Id.* Ex. L)

In determining when First Amendment protection attaches, the Second Circuit has distinguished between "speech on matters of public concern and an employee's essentially private complaint about working conditions." *Tiltti v. Weise*, 155 F.3d 596, 603 (2d Cir.1998); *see Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999); *Walker v. New York City Transit Auth.*, No. 99 Civ. 3337, 2001 WL 1098022, at *12 (S.D.N.Y. Sept.19, 2001). A "personal employment grievance" is different from a statement "protesting broad discriminatory policies or practices" or "system-wide discrimination." *Walker*, 2001 WL 1098022, at *12. For this reason, "courts in this Circuit have consistently held that 'an EEOC complaint based on race and sex discrimination is not a matter of public concern, and therefore, is not protected speech under the First Amendment.'" *de Silva v. New York City Transit Auth.*, No. CV 96–2758, 1999 WL 1288683, at *17 (E.D.N.Y. Nov.17, 1999) (quoting *Lehmuller v. Incorporated Village of Sag Harbor*, 944 F.Supp. 1087, 1095 (E.D.N.Y.1996)).

Although Nonnenmann's protected statements were made as part of an individual complaint to the EEOC and NYPD's OEEO and as part of one individual's lawsuit, his statements were made on behalf of a colleague, and were not self-serving or related to his own personal grievance. This case is different from one in which an employee has filed his or her own EEOC complaint, *see de Silva*, 1999 WL at *17; *Lehmuller*, 944 F.Supp. at 1095, or in which an employee has brought complaints to a supervisor that are "personal in nature and generally related to h[is] own situation," *Walker*, 2001 WL 1098022, at *12. At least one court has

held, in an analogous case, that testifying on behalf of a group of plaintiffs and helping to defend them and to bring their sex discrimination concerns before management was a matter of public concern. *See Marshall v. Allen,* 984 F.2d 787, 795–96 (7th Cir.1993). In allowing a First Amendment claim, the Seventh Circuit noted that the plaintiff had "no personal stake in the outcome of the [group's] contentions," and was "not engaged in a mundane employment dispute," but was rather acting *"against"* his personal interests in "protesting the illegitimate policies of a government agency." *Id.* at 796.

■ In determining the scope of protected speech, I believe it is the scope and nature of the employment dispute to which plaintiff's speech is addressed, rather than the level of plaintiff's self-interest, that is dispositive. Although Nonnenmann was not acting in his own self-interest in testifying on behalf of Officer Breland, that does not change the fact that he was participating in a particular dispute related to one employee that cannot more broadly be considered a matter of public concern. Although Sergeant Nonnenmann's testimony addressed serious and important issues about the "racial and gender prejudices" of certain supervising officers, his testimony was limited to the conduct of a few supervising officers in Sergeant Breland's precinct, which is different from "system-wide discrimination." Furthermore, in their settlement agreements, both Officer Breland and Sergeant Nonnenmann settled for money damages only; neither agreement provided for modification of the NYPD's discriminatory policies or practices. *See Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 143 (2d Cir.1993) (rejecting a First Amendment claim in which a female employee complained of sexual harassment, but did not seek "relief against pervasive or systemic misconduct"

or make "an overall effort ... to correct allegedly unlawful practices or bring them to public attention" (internal quotation marks omitted)). Under the circumstances in this case, Nonnenmann's testimony on behalf of Officer Breland related to a private employment dispute and did not involve a matter of public concern that warrants First Amendment protection.

## IV

■ Nonnenmann argues also that the retaliatory actions taken by defendants have violated his equal protection rights under the Fourteenth Amendment. Without any supporting case law, he argues that because he testified on behalf of a black female, Officer Breland, he is entitled to the same equal protection rights as if he himself were a black woman. This is plainly incorrect. Any discrimination against Nonnenmann resulting from his testimony on behalf of a black, female officer, does not constitute discrimination based on membership in a "suspect or quasi-suspect group," such as "race, religion, nationality or gender." *Birmingham v. Ogden,* 70 F.Supp.2d 353, 372 (S.D.N.Y.1999). When a plaintiff alleges a claim of race or gender discrimination, he must claim that he was selectively treated because of *his* race or gender. *See, e.g., Nat'l Congress for Puerto Rican Rights v. City of New York,* 75 F.Supp.2d 154, 167 (S.D.N.Y.1999) ("In a race case ... plaintiffs must show that similarly situated individuals of a different race were not subjected to the challenged conduct."). Nonnenmann has made no allegation that he was treated differently because he is white or male.

Of course, an employer is not free to retaliate at will against an employee who testifies on behalf a victim who is a member of a protected class. The explicit provisions of § 704(a) of Title VII clearly and

strictly prohibit such activity. 42 U.S.C. § 2000e–3(a) (1994). I have already addressed plaintiff's Title VII retaliation claims above. The Fourteenth Amendment itself, however, does not recognize a witness as a member of a protected class, and for that reason defendants' motion for summary judgment is granted as to plaintiff's Fourteenth Amendment claims.

### V

Finally, plaintiff argues that defendants have infringed his rights under the Equal Pay Act. This claim is without merit and summary judgment is granted.

 The Equal Pay Act reads in relevant part as follows: "No employer … shall discriminate … between employees on the basis of sex by paying wages to employees … at a rate less that the rate at which he pays wages to employees of the opposite sex … for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions …." 29 U.S.C. § 206(d)(1) (1994). The purpose of the act, as is evident from the language of the statute, is to "prohibit[ ] employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work' " *Ryduchowski v. Port Authority*, 203 F.3d 135, 142 (2d Cir.2000) (internal quotation marks omitted).

 To make a claim under the Equal Pay Act, a plaintiff must show: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Id.* (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)) (internal quotation marks omitted). Nonnenmann has demonstrated none of these elements. In fact, in his pleadings he undertakes no discussion at all of the relative salaries of men and women in the NYPD, and he does not explain why he has included this claim in his complaint. I agree with defendants that "the Equal Pay Act has no bearing on this case whatsoever" (Defs.' Mem. of Law at 15), and therefore grant summary judgment dismissing all plaintiff's Equal Pay Act claims.

\* \* \* \* \* \*

Nonnenmann's pre-spring 1999 claims are precluded either by his state court settlement agreement or his untimely EEOC filings; summary judgment is granted as to his post-spring 1999 claims, which are insufficient to establish a Title VII adverse employment action. Summary judgment is also granted on plaintiff's First Amendment claims because his speech did not address a constitutionally protected issue of public concern. Nonnenmann's Fourteenth Amendment and Equal Pay Act claims are without merit and summary judgment on these claims is granted. Because no claims remain, it is unnecessary to determine whether the NYPD is a proper defendant in this action. In accordance with the above dispositions, defendants' motion for summary judgment is granted.

SO ORDERED: